No. 98,747

COMPREHENSIVE HEALTH OF PLANNED PARENTHOOD OF KANSAS AND MID-MISSOURI, INC., *Petitioner*, v. PHILL KLINE, JOHNSON COUNTY DISTRICT ATTORNEY, *Respondent,* and STEPHEN N. SIX, KANSAS ATTORNEY GENERAL, *Intervenor.*

(197 P.3d 370)

Opinion filed December 5, 2008.

*Robert V. Eye*, of Irigonegaray & Associates, of Topeka, argued the cause, and *Pedro L. Irigonegaray* and *Elizabeth R. Herbert*, of the same firm, and *Douglas N. Ghertner* and *Robert A. Stopperan*, of Slagle, Bernard & Gorman, of Kansas City, Missouri, and *Roger K. Evans*, of Planned Parenthood Federation of America, of New York, New York, and *Helene T. Krasnoff*, of Planned Parenthood Federation of America, Washington, D.C., were with him on the briefs for petitioner.

*Caleb Stegall*, of The Stegall Law Firm, of Perry, and *Phill Kline*, respondent, argued the cause, and *Edward D. Greim* and *Todd P. Graves*, of Graves Bartle & Marcus, LLC, Kansas City, Missouri, and *Carly F. Gammill*, of American Center for Law & Justice, Washington, D.C., and *Edward L. White, III*, of American Center for Law & Justice, Ann Arbor, Michigan, were with him on the briefs for respondent.

*Michael C. Leitch*, deputy attorney general, argued the cause and was on the brief for intervenor Attorney General Stephen N. Six.

The opinion of the court was delivered by

BEIER, J.: This is an original action in mandamus filed by petitioner Comprehensive Health of Planned Parenthood of Kansas and Mid-Missouri, Inc. (CHPP), to challenge respondent Phill Kline's handling of patient records obtained from CHPP pursuant to an inquisition subpoena issued when Kline was Attorney General. We decide whether CHPP has met its burden to obtain relief in mandamus and whether Kline's behavior merits sanction as civil contempt or otherwise.

## Factual and Procedural Background

On February 3, 2006, this court issued its opinion in *Alpha Med. Clinic v. Anderson*, 280 Kan. 903, 128 P.3d 364 (2006), which arose out of Kline's issuance of inquisition subpoenas duces tecum under K.S.A. 22-3101(1). Our decision identified three constitutional privacy interests implicated by subpoenas for patient records directed to Women's Health Care Services of Wichita, P.A. (WHCS), and CHPP, identified in the opinion as Alpha Medical Clinic and Beta Medical Clinic. Both clinics perform abortions. We balanced the patients' individual privacy interests against the societal necessity and compelling State interest in pursuing criminal investigations, outlining procedures to be followed for redaction of the records before the district court allowed them to be turned over to the Attorney General. See *Alpha*, 280 Kan. at 924-25. We did not rule upon exactly which data was to be redacted or how the records were to be handled once they were placed in Kline's hands. See *Alpha*, 280 Kan. at 924-25. During oral argument in *Alpha*, Chief Deputy Attorney General Eric Rucker, who argued the case on behalf of then Attorney General Kline, asserted that Kline was not seeking patient names.

In *Alpha*, the clinics urged us to hold Kline in contempt of court, in part because he had attached to his brief portions of a district court transcript and order, had discussed the inquisition at a press conference, and had permitted distribution of the transcript after the conference concluded, all allegedly in violation of court seal orders.

In response to the clinics' contempt argument, we first observed that those allegations over which this court had jurisdiction concerned indirect criminal contempt. Indirect contempt deals with conduct occurring outside the presence of a judge. *Alpha*, 280 Kan. at 926. Proceedings in criminal contempt attempt to " ' " 'preserve the power and vindicate the dignity of the courts and to punish for disobedience' " ' of court orders; criminal contempt tends to obstruct the administration of justice." *Alpha*, 280 Kan. at 927 (quoting *State v. Davis*, 266 Kan. 638, 645, 972 P.2d 1099 [1999]). We continued:

"In his initial response to this court's Order to Show Cause, the attorney general contended that the documents attached to his brief were 'but a very small fraction of the entire record before the lower court in the inquisition; we attached only what we believed necessary to support our arguments in this segment of the proceedings.' As for the news conference, Kline asserted that he 'stressed the privacy protections put in place by the lower court and the law to prevent public disclosure of the medical records sought. . . . I did not refer to the transcript of the lower court's hearing, nor did I provide it at the news conference. Later that day, my communications director, after our brief had been filed, provided the transcript electronically to those who requested a copy.' He argued that 'it was seemingly inconsistent to keep these pleadings under seal while at the same time suggesting that oral argument was likely.' Kline also argued that the press conference was 'necessitated by the false impression left by the public filing of Petitioners' brief and [Petitioners'] representation of the record.'

"Kline's initial responses were troubling. He admitted that he attached sealed court records to a brief he knew would be unsealed; that he did so knowingly because, in his sole estimation, he believed it to be necessary to further his arguments; that he held a press conference on this criminal matter merely because he determined that petitioners had painted his previous actions in an unflattering light; and that he later permitted his staff to provide electronic copies of the sealed transcript to anyone who requested them. In essence, Kline has told this court that he did what he did simply because he believed that he knew best how he should behave, regardless of what this court had ordered, and that his priorities should trump whatever priorities this court had set. Furthermore, although there is conflict between the parties on exactly what was said in the press conference, *i.e.*, whether the actual content of the sealed documents was discussed, Kline's stated reason for holding the conference—to combat what he saw as unflattering earlier press coverage—does not appear to be among the permissible reasons for an attorney in his position to engage in extrajudicial statements under Kansas Rule of Professional Conduct 3.6 (2005 Kan. Ct. R. Annot. 473) [now KRPC 3.8 (2007 Kan. Ct. R. Annot. 520)]. This too is troubling.

"At oral argument before this court, Kline's [personal] lawyer, a former four-term attorney general, wisely altered the tone of Kline's response. He characterized whatever mistakes Kline may have made as honest ones and said his client was acting in good faith. He also, as Kline eventually had done for himself in his written response, made a classic 'no harm, no foul' argument: Any disclosure of sealed material did nothing to impair the orderly nature of this proceeding or the soundness of its eventual result; the attorney general and his staff did not release information harmful to personal privacy, prejudicial to the administration of justice, or detrimental to this court's performance of its duties.

"We conclude that, despite the attorney general's initial defiant tone, he should not be held in contempt at this time. No prejudice has resulted from his conduct, a distinguishing feature of the cases cited to us by petitioners. . . .

"This is . . . the first [case] in memory when this court has required public briefs and oral argument on a sealed record. Although we believe this directive was more challenging than confusing, and although the actions complained of here might well be characterized as criminal contempt in a different case, we are inclined to grant the attorney general the benefit of the doubt here. This is an unusually high-profile case attracting keen public interest throughout the state. We caution all parties to resist any impulse to further publicize their respective legal positions, which may imperil the privacy of the patients and the law enforcement objectives at the heart of this proceeding." 280 Kan. at 928-30.

On May 23, 2006, approximately 3½ months after this court released *Alpha*, District Judge Richard Anderson of Shawnee County, the judge overseeing the inquisition, issued what the record before us reveals as his only written post-*Alpha* protective order concerning the patient records from the clinics. The order set forth the procedure to be followed to effect the safeguards outlined in *Alpha*, appointing a Topeka lawyer to assist the judge and act as

"special counsel for adult patients and as guardian ad litem for minor patients for the purpose of making recommendations to the Court to protect the confidentiality of the identity of any patients . . . and to protect against release of sensitive, confidential, and privileged information which is not relevant to the medical procedure and/or the criminal investigation. Special Counsel shall supervise the reproduction and release of copies of all medical records. In addition, Special Counsel shall make duplicate copies of all medical records in the form released to the Attorney General and return complete copies of such copied medical records to the medical facilities."

Judge Anderson would later testify that, aside from this order and earlier nondisclosure provisions contained in the subpoenas directed to the clinics, he relied on a series of conversations with

Kline and his subordinates, what he called an oral "working agreement," to control dissemination of information generated in the inquisition, including the redacted patient records. Judge Anderson also would testify that, although he thought the guidelines of *Alpha* had been adhered to, he believed a parent of a patient described in the redacted records would be able to identify his or her daughter. Judge Anderson trusted Kline to behave ethically and professionally.

"My expectation, as in any case, I have to trust the prosecutor that comes in to open inquisitions not to do things with information that would harm the legal proceeding. So I did not expect anything that would be ascertained as evidence or accumulated as evidence would be shared with the public . . . .

   "But all of my focus would be on . . . legitimate law enforcement objectives. I don't believe the public at that stage of the proceeding, the press, or the Legislature for that matter, needs to get involved in the prosecutor's business of prosecuting the crimes or the defendant—affecting the defendant's right to defend the crimes. I feel very strongly about that."

Judge Anderson thus left any restrictions on potential witnesses who were given access to the redacted patient records from the clinics entirely up to Kline and his subordinates.

The redacted records were given to Kline's subordinates on October 24, 2006. They took approximately 2 weeks to make two copies and then return the originals of the redacted records to Judge Anderson.

Shortly after the records were given to Kline, he and two of his subordinates, lawyers Rucker and Stephen Maxwell, presented Judge Anderson with a summary of the records that Kline wanted to disclose publicly. Kline was in the final days of a highly contentious political race to retain his position; his opponent was then Johnson County District Attorney Paul Morrison. According to Judge Anderson, Kline—who had argued unsuccessfully to Judge Anderson while *Alpha* was pending before this court that the judge should not subject Kline to the nondisclosure provision in the subpoenas directed to the clinics—took an "aggressive" position on the summary and his potential use of it. In Judge Anderson's view, Kline appeared "somewhat desperate" to counter charges advanced by Morrison in the campaign. Kline also told Judge An-

derson that he did not believe the judge could control what an attorney general disclosed to the public. Regardless of the merit or lack of merit of that view, Judge Anderson warned Kline that he would have trouble persuading Judge Anderson to rule in his favor on any future inquisition issues if he publicly disclosed information from the patient records. At no point in this discussion with Judge Anderson did Kline, Rucker, or Maxwell divulge any plans for television or other public appearances concerning the inquisition or its results.

On November 3, 2006, the Friday before election day and before Kline's subordinates returned the originals of the redacted records to Judge Anderson, Kline was a guest on a nationally televised program, "The O'Reilly Factor." During the broadcast, host Bill O'Reilly suggested that O'Reilly had been made privy to the contents of the redacted records. Kline later testified that he "certainly" considered his appearance on O'Reilly's show to be appropriate despite this court's cautionary language about publicity in *Alpha* and apparently despite Judge Anderson's insistence that Kline and his subordinates were bound by the subpoenas' nondisclosure provision. Kline testified that he had decided to appear on the O'Reilly program because his office had been inundated with calls about his intentions, and he wanted to alleviate fears that his office was seeking identities of patients.

Kline's appearance on "The O'Reilly Factor" prompted the clinics to press Judge Anderson to hold Kline in contempt before election day. They also filed a sealed action for writ of mandamus and a motion with this court on the day before election day, November 6, 2006, seeking a stay of the inquisition, sealing of the records from Kline's office, and deposit of the records with a special prosecutor or master appointed to investigate any leak of information from, or other mishandling of, the records.

Morrison defeated Kline in the attorney general's race. Approximately 2 weeks after the election, Judge Anderson declined to launch contempt proceedings against Kline in connection with the O'Reilly show. Although Judge Anderson would later testify that he was "very upset" with Kline for putting himself in a position allowing O'Reilly to claim he had seen the redacted patient records,

Judge Anderson had concluded after questioning Kline, Maxwell, and Kline investigator Tom Williams under oath that Kline had not given the records to O'Reilly, if, in fact, O'Reilly had seen them at all. We denied the clinic's November 6 petition for writ of mandamus on November 30, 2006.

During the 2 weeks after the elections, Kline, Rucker, Maxwell, and Williams shared information from the redacted patient records and other inquisition results with at least three potential medical experts, including Dr. Richard Gilmartin, a pediatric neurologist from Wichita, and Dr. Paul McHugh, a psychiatrist from Baltimore, Maryland. Rucker had obtained Gilmartin's name from a representative of Kansans for Life; he would later testify that he may have told the representative about the nature of the records. Kline had obtained McHugh's name from a representative of Women Influencing the Nation. Both Kansans for Life and Women Influencing the Nation are anti-abortion advocacy organizations.

The record before us reflects that Gilmartin took no notes and that no patient records were left with him. Maxwell and Williams evidently left copies of patient records and other inquisition documents with McHugh. These other documents included pregnancy termination information obtained from the Kansas Department of Health and Environment (KDHE) which, when cross-referenced to patient records and/or other sources mined by Kline and his subordinates during the inquisition, enabled Kline to identify patients by name. The record reflects that the time period when Kline and his subordinates were seeking the cross-reference data was before or during the pendency of *Alpha*. The record is unclear on exactly when McHugh returned the records left with him or whether he first made copies before returning the set he had been given. Judge Anderson had not required Kline or his subordinates to obtain confidentiality agreements from any persons to whom the records themselves or information within them was disseminated; and Kline and his subordinates did not take this step on their own.

On December 11, 2006, Republican precinct committee members in Johnson County selected Kline to complete Morrison's

term as Johnson County District Attorney, once Morrison was sworn in as Attorney General on January 8, 2007.

It was in this time frame that Kline and Maxwell conversed with Judge Anderson about Kline's desire to send the patient records produced by the clinics in the inquisition to other prosecutors, specifically mentioning Shawnee, Sedgwick, and Johnson Counties. According to Judge Anderson, Kline and Maxwell did not tell him how this would be accomplished; they did not tell him that the records would not be received in Johnson County until Kline had taken office there; they did not tell him that they also would send the records from WHCS, a clinic in Sedgwick County, to Johnson County. Kline did tell Judge Anderson that the transformation of his Attorney General inquisition into a Johnson County District Attorney investigation would be "seamless." Judge Anderson would eventually testify that, during one of his conversations with Maxwell about the movement of patient records to Johnson County, he told Maxwell, "Just be sure that you do that in a very orderly and regular sort of way."

Shortly before leaving the Attorney General's office, on December 20, 2006, Kline filed charges in Sedgwick County against Dr. George Tiller of WHCS. Kline supported the charges with an affidavit from McHugh, an affidavit from Williams, and information from the redacted patient records. The following day, District Judge Paul Clark dismissed the Sedgwick County charges at the request of Sedgwick County District Attorney Nola Foulston.

On December 27 or 28, 2006, Kline announced that, as Attorney General, he would appoint Wichita lawyer and anti-abortion activist Donald McKinney as a special prosecutor. The clinics filed a joint motion for a protective order with Judge Anderson, seeking to ensure that the patient records produced in the inquisition would remain with Judge Anderson and in the Attorney General's office on Kline's exit from that office. The record reflects that Judge Anderson received this motion on Wednesday, January 3, 2007, but he did not rule on it immediately. Judge Anderson did, however, tell Maxwell that he wanted a full and accurate written report on where all copies of the patient records were as of the

time of the transition between Kline and Morrison at the Attorney General's office.

Although Kline later testified that he directed Rucker to transport the records from the Attorney General's office to Johnson County in mid-December 2006, the actual physical movement of the records did not begin until the Friday before Morrison was sworn in as Attorney General, January 5, 2007, and did not end until Kline had been in office as the Johnson County District Attorney for several weeks. In the intervening time, the patient records were stored in more than one automobile; in Maxwell's residence; and, from January 8, 2007, until mid-February 2007, in the dining room of an apartment of another investigator, Jared Reed. The several weeks that the records sat in Reed's dining room included the day that elapsed between the point when Reed's employment with Kline's Attorney General's office ended and the point when his employment by Kline's Johnson County District Attorney's office began.

On Friday, January 5, 2007, the same day that Rucker signed a 6-month contract with McKinney, McKinney's fees to be funded by up to $25,000, apparently from the budget of the Attorney General's office, Williams removed all of the patient records obtained through the inquisition from the Attorney General's office, along with additional investigation materials and records obtained from other agencies, and placed them in a state-owned vehicle. This Friday was to be Maxwell's last day of work for the Attorney General's office. The following day, Saturday, January 6, Williams delivered the records and other materials to Maxwell's residence.

At Maxwell's residence that day, Maxwell and Williams sorted the records for distribution to various places. At some point that day, Williams contacted Reed, who came to Maxwell's residence and witnessed this process. Maxwell also was preparing a Status and Disposition Report, the written report Judge Anderson requested. The patient records and other materials were then locked in the trunk of a state-owned vehicle Williams was driving. Williams returned a set of materials to the Attorney General's office, not including any CHPP or WHCS patient records, and left the rest of the materials sorted earlier at Maxwell's house in the vehicle.

The vehicle spent the rest of that weekend parked in a secure state parking lot.

Shortly after 8 a.m. on Monday, January 8, 2007, the day Morrison was to be sworn in as Attorney General and Kline sworn in as Johnson County District Attorney, Williams and Reed met at the Shawnee County courthouse. They left five boxes of investigation materials at Judge Anderson's chambers, as well as a copy of the Status and Disposition Report. Williams and Reed also left several boxes of materials, including patient records, at Shawnee County District Attorney Robert D. Hecht's office.

After these two distributions had been accomplished, Williams received a telephone call from Rucker, who had spoken to Kline that morning before Kline was sworn in as Johnson County District Attorney. Kline had called Rucker to make sure that the patient records would be available in Johnson County and told Rucker for the first time that the materials going there needed to include records from WHCS as well as from CHPP. Kline indicated to Rucker that Judge Anderson had given permission for this to occur. Rucker, in turn, told Williams that the records headed for Johnson County needed to include the records from WHCS as well as CHPP. Williams expressed surprise and displeasure with what he apparently viewed as a last-minute change in his instructions and because the Status and Disposition Report produced and signed by Maxwell and left earlier that morning with Judge Anderson did not state that the WHCS records would go to the Johnson County District Attorney's office. According to Williams, Rucker told him that Kline had nevertheless ordered this action and that Kline had spoken to Judge Anderson about it. Williams asked for written confirmation of this order.

After the call from Rucker, Williams and Reed had to retrieve the patient records that had already been left at Hecht's office. On Rucker's instruction, they then took the records to a downtown Topeka photocopy store. Although Reed's and Williams' recollections vary slightly, apparently Reed began making copies of the WHCS records for use by Kline as Johnson County District Attorney (at the expense of the Attorney General's office) while Williams returned the state automobile they had been using. After the cop-

ying was completed, Williams and Reed returned the set meant for Hecht to his office. All of the material intended for the Johnson County District Attorney's office was then transported in Reed's personal automobile and delivered to Reed's apartment, where it was placed in his dining room.

According to the record, at 3:43 that afternoon, several hours after all of the distribution steps were completed and Morrison had been sworn in as Attorney General, in apparent compliance with Williams' request for written confirmation of the earlier order, Rucker sent an electronic mail to Williams. It stated: "Per the direction of AG Kline, I am directing you to copy all medical files and AG Kline is directing the copies be delivered . . . to the District Attorney for the 10th Judicial District before noon . . . K. Rucker Chief Deputy Attorney General (sent at 9:30 am)[.]"

Although Kline's subordinates had placed at least three boxes of materials connected to the inquisition at the Attorney General's office before they left it, the precise content of these boxes cannot be determined at this stage because no specific inventory of them was created at the time. We understand, however, as mentioned above, that the boxes contained no copies of the patient records obtained from CHPP or WHCS. On January 9, 2007, Judge Anderson sent a letter to Morrison, directing Morrison to determine whether McKinney possessed any materials in his role as special prosecutor and to supplement the Status and Disposition Report accordingly. He also directed Morrison to communicate with potential expert witness McHugh directly regarding return of the records left with him in Baltimore and offered to permit Morrison to pick up the inquisition evidence that had been left at the judge's chambers by Williams and Reed the day before. The sufficiency of access to inquisition material granted Morrison and, eventually, his replacement as Attorney General, Stephen N. Six, remains under consideration in another original action pending before this court, *State ex rel. Six v. Anderson*, Case No. 99,050.

Three days later, on January 12, 2007, in response to a letter from Morrison's chief counsel at the Attorney General's office, Kline sent a letter representing, among other things, that a report had been filed with Judge Anderson reflecting Kline's handling of

inquisition documents. The Status and Disposition Report, produced and signed by Maxwell and delivered to Judge Anderson, had not been corrected and was never corrected by Kline or by Maxwell or by any other Kline subordinate.

According to Reed, he asked Williams repeatedly whether he could bring the materials sitting in his dining room to the Johnson County District Attorney's office. He testified that his mother and apartment maintenance personnel may have been in his apartment during the time the records were stored in his dining room. Reed finally received permission from Williams to move the materials in mid-February 2007, after Williams had reassured himself about secure storage at the Johnson County District Attorney's office.

On April 9, 2007, Judge Anderson learned for the first time that Kline had taken the WHCS patient records as well as the CHPP patient records to Johnson County. Kline inadvertently disclosed this fact to Judge Anderson, and this disclosure prompted another heated discussion about the extent of the judge's authority. Judge Anderson declined to require Kline to return CHPP records; however, he ordered Kline to return the WHCS records. Had Kline refused, Judge Anderson later testified, an order citing Kline in contempt had been prepared and would have been filed. When the WHCS records were returned to Judge Anderson at a hearing on April 11, 2007, Judge Anderson asked Kline if Kline's office had kept any copies; Kline told Judge Anderson that no copies were kept. The record reflects that Kline has admitted more than once—although not in response to direct questioning by this court at oral argument in this case on June 12, 2008—that his staff members have created summaries of at least three WHCS patient records and have kept and employed those summaries in their activities in Johnson County.

Judge Anderson would later testify that Kline mentioned to him in this time period that Kline expected to be subpoenaed to testify by a legislative committee. In response, Judge Anderson told Kline "those records are not to go anywhere." Judge Anderson also would testify that, beyond the patient records themselves, he had communicated that Kline was not to share "information [from the investigation] with people that shouldn't have it. ∴ . . . I did not ex-

pect the prosecutor to share information outside of his law enforcement objectives." Judge Anderson and Kline also disagreed during this time frame on whether Kline, as District Attorney from Johnson County, had authority to open a new inquisition in Shawnee County or to seek relief from Judge Anderson under Morrison's continuation of the inquisition in Shawnee County.

Reed would later mention that he had concerns about Kline's effort as Johnson County District Attorney to obtain or maintain WHCS records. He said to Rucker: "[I]f you continue down one path to help the cause, you actually hurt the cause. When you're—you know, sometimes it's best to kind of take a step back and re-evaluate and maybe approach it a different way." Reed said Rucker replied that "sometimes the personal losses—or the benefit or gain of a—of a larger cause outweighs that of a personal impact."

On May 14, 2007, CHPP filed a motion with Judge Anderson, seeking an order to show cause why Kline should not be held in contempt, asking that Kline be required to surrender all copies of all patient records he had obtained through the inquisition and that he be required to appear and give an accounting under oath about the disposition of all such records. Kline and his staff had, at that point, maintained no written log of persons given access to the patient records. Judge Anderson denied CHPP's motion on May 15, 2007.

CHPP filed this mandamus action on June 6, 2007, asking this court to: (1) compel Kline to "comply with [the court's] directives" in *Alpha*; (2) compel Kline to "return any copies of Petitioner's medical records" to the Attorney General's Office; (3) direct Kline to provide an accounting for those records; (4) issue an order to show cause why Kline should not be held in contempt of the mandate in *Alpha*; and (5) grant any other appropriate relief, including attorney fees. CHPP also filed a motion to proceed under seal, which was granted.

Six days later, Morrison's staff approached Judge Anderson in an effort to prevent McHugh from appearing at a public event in Overland Park organized by Women Influencing the Nation. Judge Anderson directed Morrison's staff to contact McHugh directly, believing McHugh to be the current Attorney General's witness,

even though no charges had been filed by Morrison at that point in time. (This would be the same position Kline and Maxwell eventually took in testimony, *i.e.*, that they had no control over McHugh after Morrison became Attorney General on January 8, 2007, and could not direct his activities or prevent him from disclosing information obtained in the course of his earlier service to Kline as Attorney General.) Morrison's office issued a letter to McHugh to prevent his public discussion of the information shared with him by Kline and Kline's subordinates. McHugh nevertheless submitted to an interview about his review of the patient records and the information they contained, a video recording of which has been published electronically. Kline has admitted that he met with McHugh before the interview and listened in on the live exchange between the interviewer and McHugh via telephone to ensure that information he considered private was not disclosed. Judge Anderson, who had listened to at least a portion of McHugh's interview, eventually would testify that a parent of a patient described in the redacted records might be able to identify his or her daughter from the information disclosed by McHugh in the interview.

On June 22, 2007, this court ordered Kline to respond to the mandamus petition filed in this case. Five days later, one of Kline's subordinates at the Johnson County District Attorney's office made a copy of the patient records from CHPP for a fourth potential medical expert.

Kline responded per this court's order on July 12, 2007. He argued that mandamus was not an appropriate remedy and that Judge Anderson had authorized the transfer of patient records from the Attorney General's office to the Johnson County District Attorney's office.

In late August 2007, at Judge Anderson's request, Kline prepared a second affidavit for McHugh. According to Anderson, the affidavit, which the judge sought through Kline to defend the judge from allegations by Morrison of mishandling McHugh, contained "more information than [Anderson] had requested." Anderson did not expect this second affidavit to be made public. He expected it only for filing in a sealed case.

On September 4, 2007, this court permitted Morrison to intervene in this action. By this time, Morrison had closed the inquisition launched by Kline in Shawnee County, had sent CHPP a letter saying that no charges would be filed, and had begun his pursuit of 19 misdemeanor charges against Dr. George Tiller in Sedgwick County. On September 25, 2007, when Morrison filed his memorandum in support of CHPP's petition for mandamus, he attached a sworn statement of Reed, detailing the movement of patient records from the Attorney General's office to the Johnson County District Attorney's office that had occurred under Kline's direction. Morrison alleged that patient records from CHPP and other material had been taken without authorization from the Attorney General's office when Kline's term was over; that the patient records had been mishandled; and that copies of the records had been disseminated improperly. Morrison did not seek any relief beyond that sought by CHPP, asking only that the CHPP patient records be returned to the Attorney General's office.

On September 6, 2007, the second McHugh affidavit was offered for the public record in a hearing of the legislature's Special Committee on Federal and State Affairs by the same representative of Women Influencing the Nation who had earlier given McHugh's name to Kline. The committee also was given the video recording of McHugh's interview and a purported transcript of the same interview.

On October 5, 2007, this court ordered Kline to cease copying and disseminating patient records except to the extent necessary for law enforcement and to maintain a written record of any patient records henceforward copied or disseminated.

On October 17, 2007, this court directed the parties to answer three specific questions of law. Meanwhile, Kline filed more than 100 criminal counts against CHPP in Johnson County.

Because several facts underlying this action remained in dispute, on October 24, 2007, this court appointed District Judge David King as a special master to conduct an evidentiary hearing and make factual findings. We provided Judge King with a list of 17 questions to guide the proceedings before him.

On November 2, 2007, Judge King directed Kline and Morrison to provide sworn responses to each of this court's 17 fact questions.

On November 9, 2007, Kline filed a motion for rehearing and dismissal in this court, arguing that this court should rescind its order appointing Judge King and dismiss this action. Kline's principal argument in his motion was not responsive to the allegations made regarding his handling of the patient records. Rather he insisted only that he had built strong criminal cases against Tiller in Sedgwick County and against CHPP in Johnson County and that this court's oversight could impede his law enforcement goals. We did not rescind the order appointing Judge King or dismiss the action.

Kline filed his sworn responses to the 17 questions with King on November 13, 2007. Those responses included the following:

"1. What was the date on which records from Women's Health Care Services, P.A. (WHCS), and/or Comprehensive Health of Planned Parenthood of Kansas and Mid-Missouri, Inc. (CHPP), arrived in Respondent Kline's possession as Attorney General?

"RESPONSE:

"On October 24, 2006, pursuant to Kansas Supreme Court order and pursuant to a valid subpoena issued by the Honorable Richard D. Anderson, the records in question were provided to the Office of Attorney General. They were not provided to myself but were provided to and housed in the Office of Attorney General."

"2. What is the name of any individual who was or is responsible for any aspect of receipt, storage, copying, dissemination, or transmission of the WHCS and/or CHPP records and/or copies of them, of the contents of them, and/or of any description of the contents of them

a. During the time Respondent Kline held the office of Attorney General?

"RESPONSE:

"I delegated responsibility for housing and maintaining the records to my Chief Investigator Tom Williams and Assistant Attorney General Steve Maxwell, or their designees. This delegation lasted the entire time that I served as Attorney General.

b. Between the time Respondent Kline held the office of Attorney General and the time he has held the office of Johnson County District Attorney? and

"RESPONSE:

"I do not believe there was any time between the time I held the office of Attorney General and the time I held the office of Johnson County District Attorney. Whether there was any such gap in time is a question of law. If there was a gap in time between my holding of each office, then the responsibility for hous-

ing and maintaining the records remained with Chief Investigator Tom Williams and Assistant Attorney General Steve Maxwell, or their designees.

c. During the time Respondent Kline has held the office of Johnson County District Attorney?

"RESPONSE:

"As District Attorney, the delegation of authority for maintaining the records remained with Tom Williams and Steve Maxwell for the first several weeks while I served as District Attorney. At some point, the redacted records were brought to the Office of District Attorney and placed in a secure place locked in my office. The primary responsibility for maintaining the records at that time fell to myself and my Administrative Assistant Megan Harmon. Sometime during the spring or summer of 2007 the records were transferred to a locked filing cabinet near Megan Harmon's workstation.

. . . .

"4. What is the professional position and/or inquisition or investigation role of any individual to whom the WHCS and/or CHPP records and/or copies of them, any contents of them, and/or any description of the contents of them have been disclosed since the date they arrived in Respondent Kline's possession as Attorney General?

"RESPONSE:

"For purposes of clarity, I am responding to this question in two parts. First, in part (a), I list the four positions or roles that actually viewed the records themselves, copies of the records, or contents of the records. In part (b), I list the positions or roles that could arguably have viewed or received a 'description of the contents of [the records].' I make this response based on my personal knowledge only, which would only relate to acts taken on behalf of my Attorney General or District Attorney's offices. However, as discussed below, I have information and belief (and in some cases personal knowledge) of disclosures made by third parties, including Petitioner, Dr. George Tiller, and Attorney General Morrison or his staff.

a. The following classifications of individuals have received or viewed records or copies of records or any contents of WHCS and/or CHPP records:
   1. Witnesses including experts;
   2. Courts;
   3. Investigators;
   4. Other prosecutors in offices of various jurisdictions.

b. The following classifications of individuals have received, or viewed copies of, descriptions of the contents of WHCS and/or CHPP records. The phrase 'description of the contents of [the records]' could have various meanings and it is not clear to me how expansive this request is. For example, the question could relate only to disclosures of information (such as identities) which this Court or Judge Anderson have held must remain private, or it could encompass all discussions of the records that make even a reference to the cumulative meaning or legal significance of the records. To aid this Court in gathering

information I have tried to view it as expansively as common sense allows. Therefore, without waiving any objection to the scope or relevance of the question to this mandamus proceeding, my response construes this phrase to include three categories of statements, in decreasing order of specificity, that could be considered by some to be disclosures: (I) verbatim quotation of information or data contained in the redacted records; (ii) verbal or written statements that aggregate and summarize information or data contained in the redacted records; and (iii) verbal or written statements that summarize the meaning or legal significance of information or data contained in the redacted records. Additionally, because the question is not limited to disclosures by my office, my response includes disclosures (pursuant to the criteria listed above) made by other individuals of which I have either personal knowledge or, where indicated, information and belief.

1. Witnesses.
2. Courts and court clerks.
3. Investigators.
4. Other prosecutors of various jurisdictions.
5. Media.
6. Attorney General Paul Morrison during his tenure as Attorney General.

. . . .

"5. What was the date of any disclosure described in response to 4 above?
"RESPONSE:

"The disclosures identified in part (a) and parts (b)(1) through (6) of my response to question 4, above, sometimes occurred on multiple occasions. For example, there were numerous phone conversations with expert witnesses and potential expert witnesses that often included discussions regarding record contents which fell anywhere along the three-category continuum of 'specificity' that I identified in part (b) above, from more specific discussions (category (I)) to very generalized discussions that were more about the conclusions to be drawn from the records than about the contents of the records themselves (category (iii)). I cannot pinpoint the dates or times of such conversations. Furthermore, investigators and other prosecutors in my office generally led the investigative effort. They had numerous conversations with prospective witnesses which I cannot delineate and of which your Respondent is not fully aware.

"Nonetheless, there are a few specific dates that I can identify or come close to identifying. These dates and occasions are as follows:

a.   In November, 2006[,] I first spoke with Dr. Paul McHugh of Johns Hopkins University about serving as an expert in the potential case against Dr. George Tiller for criminal late-term abortion. Our first phone conversation lasted approximately 5 minutes. I gave a generalized description of the case sufficient to confer with Dr. McHugh regarding the subject matter of the case and determine whether to use Dr. McHugh. (Based on his responses, I decided to retain his services.) Immediately prior to that phone conversation I had initiated a nationwide search for a top psychiatric expert which led to Dr.

McHugh. In that search I gave generalized descriptions of the case and informed those with whom I spoke that the late-term abortions were being performed for 'mental health' reasons. This gave them sufficient information to assist me in finding an expert regarding such issues. Subsequent to this time, I believe that Dr. McHugh also received hard copies of some of the files from my staff. I believe that Dr. McHugh also received a summary of the records which I had drafted.

. . . .

e.  Copies of the records provided to Shawnee County District Attorney Robert Hecht were provided in person in late December of 2006 or early January of 2007.

f.  In mid-December of 2006 I issued an order to my staff that copies of the redacted records be made ready for transfer to the Johnson County District Attorney's office. I was not personally involved in or familiar with the details of the referral or the timing of the provision of the copies.

g.  . . . Upon information and belief, Dr. Gilmartin was consulted as a potential expert witness by Chief Deputy Attorney General Eric Rucker. I am not aware whether Dr. Gilmartin did in fact review copies of the documents or was given any information regarding the contents of the records.

h.  During the Spring or Summer of 2007 I began to consult with potential expert witnesses regarding the records. These discussions included numerous phone conversations and writings regarding record contents to new experts. These communications continue to this day.

. . . .

k.  During 2007, various potential witnesses in the Johnson County matter have been given generalized descriptions of the files. This did not involve viewing the records or quoting verbatim any data from the files, and these were made in a very general nature. Certain expert witnesses or potential expert witnesses were shown the records or a portion of the records.

l.  I, by phone, have discussed in general terms the contents of the medical files with numerous authors of various papers and studies relating to fetal viability, determination of gestational age of a fetus, fetal gram weight and development, preparation of pathology reports, counseling measures for women and children, etc. These conversations did not involve viewing the records or quoting verbatim any data from the files. I do not recall the specific dates or times of these discussions.

m.  I have discussed, by phone, the general contents of the records with various legal counsel representing women and children who have engaged in civil actions against affiliates of Petitioner and with law enforcement agencies involved in investigations of Petitioner and/or affiliates of Petitioner. Again, I do not remember the times and dates of such discussions.

"6.  What was the method of transmission for the disclosure described in response to 4 above?

"RESPONSE:

[Using the same alphabetic designations above, the following specifies the method of transmission for each disclosure mentioned in response to question 5.]
f. I have no personal knowledge as to how the files were copied or transferred.

. . . .

k. I have no personal knowledge as to how information regarding the files was disclosed.

"7. What is the explanation for the necessity of or desire for any disclosure described in response to 4 above?

"RESPONSE:

. . . .

"The Need and Reasons for Information-Sharing in this Case

"In many ways, this case is similar to the investigation of the criminal electronic solicitations of a child. The investigation involved an ongoing investigation, an inquisition and the procurement of record subpoenas in that inquisition, and numerous discussions with potential witnesses in order to further the investigation and/or individuals that would assist in an understanding of the evidence. Once Judge Anderson affirmed that the mandates of this Court in the Alpha case were met, the only restriction[s] on dissemination were considerations of Rule 3.6 and other applicable Kansas Supreme Court rules.

"Pursuant to those ethical standards, any generalized discussions with the media were done to correct misperceptions or to confirm and ensure that identities of adult women were not sought nor available in the file. This was necessary due to a massive campaign through media, direct mail and phone calling that led thousands to believe that their personal medical records were in jeopardy and about to be released to the public. Further, the clinics always maintained a media posture that intimate psychiatric details and sexual histories specific to certain individuals were about to be released by the Attorney General's office. I did all I could to address those fears and bolster public confidence in the prosecutor's office, the Kansas courts, and the criminal system.

. . . .

"9. Exactly what Inquisition records and/or documents, other than WHCS and/or CHPP records, were transferred by Respondent Kline in his position as Attorney General to Respondent Kline in his position as Johnson County District Attorney?

"RESPONSE:

"This question asks about 'inquisition records and/or documents.' It is my understanding that the only items at issue in this case are the medical records of Petitioner or any documents containing information from those medical records. However, the question is not so limited, and without waiving any objection as to the relevance or scope of this question, my response will construe this phrase as broadly as common sense allows.

"There are roughly four categories of documents that could fall under the phrase 'inquisition records and/or documents.' First, there is the small amount of

records actually obtained from Petitioner in this case. I understand this category has been excluded from this question by the phrase 'other than WHCS and/or CHPP records.' Second, there is the large mass of evidence produced pursuant to the many subpoenas obtained by my staff during the course of the inquisition over several years. Third, there are pleadings and other papers filed with the Court in which the inquisition was opened. Fourth, there are draft pleadings, attorney notes, and summaries compiled by attorneys and investigators working on the inquisition. Of course, there are also investigative files separate and apart from the inquisition, into which I do not understand this question to have inquired.

"With this clarification, I have no knowledge of any 'inquisition records and/or documents' that have been transferred by me in my position as Attorney General to myself in my position as District Attorney. I do have information and belief that electronic copies and drafts of pleadings and legal research compiled by Assistant Attorney General Stephen Maxwell (category 4, above) were transferred by Mr. Maxwell to his new office at the Johnson County District Attorney during transition. However, it is my information and belief that these did not include attorney notes and summaries, as I am not aware of any summaries of the files, etc. that were transferred and as District Attorney have had to ask staff to recreate such summaries. I have made requests to Attorney General Morrison for assistance in this regard, however, such assistance has been not forthcoming.

"10. What was the date and time of any transfer described in response to 9 above?
"RESPONSE:
"I do not know.

"11. What was the method of transmission for the transfer described in response to 9 above?
"RESPONSE:
"The only such transmission that I recall is the one identified in [my] answer to question 9. I have been informed that this occurred by making a disc copy of Mr. Maxwell's file that he maintained on his computer.

. . . .

"13. What was the legal authority supporting any transfer described in response to 9 above?
"RESPONSE:
"Upon information and belief, Mr. Maxwell was granted permission to obtain a disc copy by Mr. Eric Rucker who served as Chief Deputy Attorney General.

"14. What, if any, security measures have been imposed to ensure confidentiality of the WHCS and/or CHPP records and/or copies of them, of the content of them, and/or of any description of their content, from the time they came into the possession of Respondent Kline as attorney general through the present?
"RESPONSE:
"As discussed in my response to question 2, I have delegated management of the files to Assistant Attorney General Stephen Maxwell and Chief Investigator Thomas Williams, or their designees. The files were generally kept under lock

and key and access restricted. I did not have direct access and could only review the files with others present. I am not aware of what other measures were put in place by Mr. Maxwell, Mr. Williams, or their designees."

Judge King held his evidentiary hearing on November 19, 20, and 21, and December 3 and 4, 2007. Kline's testimony in that hearing mirrored his previous sworn written responses to our 17 questions.

For example, when Kline was asked about the content of Williams' affidavit supporting the charges filed in December 2006 in Sedgwick County, Kline responded: "I don't know if I actually read Mr. Williams' affidavit before its submittal." Kline's testimony regarding the second McHugh affidavit, which Kline had typed personally, and how it had reached the legislative committee also is illustrative. Kline testified that he didn't "recall" sending the affidavit to anyone but Judge Anderson but later said:

"A. [By Kline] Well, wait, wait, wait. There was a request by the Legislature as to whether Doctor McHugh would come and testify in Kansas. . . . [T]here was a request of me to put persons in contact. I provided that information.

. . . .

"Q. [By Michael C. Leitch for the Attorney General] Did you talk to Doctor McHugh about providing such an affidavit to the Legislature?

"A. I don't recall.

"Q. Did you ask him to send a copy to the Legislature?

. . . .

"A. I don't believe I did.

. . . .

"Q. And can you tell us why you believe that the affidavit from McHugh may have been given to that committee by [a particular doctor]?

"A. I would imagine they thought it relevant to the proceedings.

"Q. Okay. That wasn't my question. I'm asking you why you believe that the committee may have gotten that from [a particular doctor].

"A. They believed it was relevant to the proceedings.

"Q. Yes. Why do you believe that [a particular doctor] was the source of the affidavit identified in Intervenor's Exhibit 17?

"A. I suppose because he had it.

"Q. Okay. And can you tell us the basis for—for your knowledge that [a particular doctor] had the affidavit?

"A. I'm not sure.

"Q. Okay. Well, why do you—I mean, you've told us that you believed that it could have come from [a particular doctor]. What's the factual basis for that

belief?

. . . .

"A. As you mentioned in your brief, my wife was at the proceeding. And I—she informed me as I recall.

"Q. Okay. So the only basis of your knowledge of—of [a particular doctor] providing that affidavit is statements to you by your wife?

"A. As I recall, I became aware that [a particular doctor] provided this affidavit by statements of my wife. That's what I recall.

"Q. And what do you recall as to who gave the affidavit to [the particular doctor.]

"A. I don't recall.

"Q. Did your wife give the affidavit to [the particular doctor]?

"A. Again, I don't know. I don't recall how [the particular doctor] obtained the affidavit.

"Q. Did you give a copy of the affidavit to your wife?

. . . .

"A. I don't recall."

Later in the hearing, Judge King followed up on this topic.

"Q. Okay. Final area and then we'll be off to lunch here pretty shortly. You were asked about you have information that the affidavit which is Intervenor's Exhibit 17 that was presented to the Federal and State Affairs Committee, that this may have been presented through the testimony of [a particular doctor.] And you indicated that the basis of that testimony was that your wife attended the hearing; is that correct?

"A. My wife was present at the hearing, as I recall. I was informed that the affidavit was presented, an affidavit from Doctor McHugh was presented.

"Q. Okay. That prompted the question whether you gave a copy of the affidavit to your wife. And your testimony was 'I don't recall.'

"A. I don't believe I did.

"A. Doctor McHugh did not provide any services to the Office of District Attorney of Johnson County, and he's not an expert in any of the cases or contemplated to be an expert in any of the cases that I'm investigating or proceeding with. So he's received no compensation relating to his duties or he's had no duties while I've been District Attorney.

"Q. This was a short time ago relatively. You're talking about giving something that has some significance in your professional responsibilities to a person who is very significant to you, your wife. As a fact-finder, it is hard for me to understand how you would not recall whether you had or had not given a copy of this affidavit to your wife. So I am going to invite you, if you can be more specific about your recollection.

"A. Okay. I don't believe I gave a copy of this affidavit to my wife. I don't recall any instance of giving this affidavit to my wife.

"Q. If you would have, would you recall it?

"A. Probably. You have [given] me a hint that I should. But Judge —

"Q. Well —

"A. — I'm not —

"Q. I just said as a fact-finder that—I understand people's memory and—and things, but there are certain things that they just have the ring that it's hard to see why you wouldn't recall that. And so I wanted to invite you, if you had a more specific recollection or to explain to me why you can't recall whether you had done that.

"A. Sure.

"Q. It's a short period of time ago, it's an important record, it's a high-profile record and it's given to a person who's very significant, you know, the—

"A. If I may, let me try to explain. I didn't see this record as that significant. All of the information in that record was already public knowledge. Doctor McHugh had already presented himself in Kansas City, it was a request of Judge Anderson, it was in no way sealed. I don't see this record as significant, it doesn't identify patients, it states his role in the case which had already been reported on, and it states his opinions which had already been made public. So I—

"Q. Okay.

"A. I did not have a concern about that particular affidavit, which was not in any court proceeding that I was aware of.

"Q. I'm satisfied with the explanation concerning its significance. . . .
[I]f I provided it to my spouse or I think that a reasonable person if they provided it to their spouse would remember it or not, especially when it was only, what was it, two months ago. It just seems to me that I would have—I would expect someone to have a recollection. And—and so that's why I'm asking you if you can—and you answered your question—answered the question by saying 'I don't believe I did.' Is that—that what your best recollection is?

"A. Absolutely that's my best recollection. I don't know of any reason why I would give that to my wife. I doubt my wife has read it, but—

"Q. Do you believe that you would remember it if you had given it to your wife?

"A. Your honor, probably."

When Judge King asked Kline whether he had placed restrictions on reuse of the information provided to experts or consultants, Kline said: "I don't know if my office did, Your Honor. . . . The primary duties rested with Mr. Maxwell, Mr. Williams and at times Mr. Rucker." When Judge King asked if Kline recalled instructing his subordinates on such restrictions, Kline said: "I don't recall doing so." King then asked whether Kline would recall if he had done so. Kline said: "I think it's likely that I would. I don't recall doing so." King pressed on, asking again about Kline's

meaning, and Kline finally responded that, to the best of his information, he did not communicate any instructions on reuse of information by witnesses.

Kline took the position before Judge King that he was both the Attorney General and the District Attorney of Johnson County for approximately 1 hour on January 8, 2007, but he insisted that he did not perform any act in either capacity during that period. Judge King asked: "[D]id it occur to you that to protect the legitimacy of your actions in any reasonable mind that every "T" ought to be crossed, every "I" dotted in relation to the transfer of these records to Johnson County? In other words, . . . make sure that that was done in a very . . . meticulously careful, well-documented, open to . . . any reasonable scrutiny manner?" Kline said that he believed he had effected the movement of the patient records from the Attorney General's office to the Johnson County District Attorney's office in such a manner and that he didn't want to compromise the investigation or have to start over once he reached Johnson County.

Judge King also attempted to walk Kline through his sworn written responses to this court's 17 questions during the evidentiary hearing. Again, however, Kline repeatedly professed ignorance and attempted to deflect the inquiry by invoking his delegation of responsibility to Maxwell and Williams.

Judge King finally admonished Kline and counsel. He ordered Kline to submit supplemental sworn written responses, specifically instructing him that institutions, *i.e.*, public officers such as the Attorney General and the Johnson County District Attorney, are charged with knowledge of their subordinates and their activities. Judge King explained to Kline and counsel that it was not sufficient for Kline to disclaim personal knowledge; rather, he had a responsibility to obtain information in the possession of others within his institution and be responsive to the questions.

Kline filed his supplemental sworn written responses to this court's questions on November 30, 2007. The record demonstrates continuing insufficiency. One example is the supplemental responses' failure to disclose that Brian Burgess, Kline's spokesman, is among those who have had repeated access to the patient records

in Kline's possession. Nor is any reason given for Burgess' access, although his name clearly appears multiple times in the written record Kline was ordered by this court to begin maintaining on October 5, 2007, and to file twice thereafter. In addition, despite Judge King's earlier admonition, Kline's supplemental responses continued to point out his lack of personal knowledge.

Judge King submitted his final report to this court on January 10, 2008. His findings, in addition to those covered by the background recited above, included the following: Kline's movement of patient records and other inquisition materials from the Attorney General's office to the Johnson County District Attorney's office was not done in an ordinary manner. Although there are no written protocols or procedures for exactly how prosecutors are to go about sending investigation materials from one office to another, Judge King wrote, "the exchange of records in this case was handled differently than any other such information exchange described by any of the witnesses. It was also different from any other information exchanges that Attorney General Kline undertook in relation to these records." No written documentation of the movement of the patient records in this case was created or maintained, and the Status and Disposition Report ordered by Judge Anderson was incorrect. Attempts by witnesses to characterize Kline's behavior here as a "transfer" or "referral" or "sharing" were merely attempts to justify the procedure's shortcomings; and the patient records were not handled in a manner that "stood up to the highest scrutiny. Such scrutiny surely should have been expected." In addition, Judge King wrote: "Kline and his subordinates gave various reasons why the transfer of [inquisition] materials, including the CHPP and WHCS records, to the Johnson County District Attorney's office was handled in the manner it was."

Judge King also found that Morrison made public statements that were hostile to the merit of Kline's inquisition. In addition, "Morrison and his transition staff were not cooperative with Kline and his transition staff: Kline was denied a secure storage area at the Johnson County District Attorney's office; Kline was not provided with office space . . . ."

Judge King also found that the evidence did not support any allegation that Kline or his subordinates gave patient records to O'Reilly. In addition, according to Judge King, the evidence did not support an allegation that Kline or his subordinates were directly responsible for the disclosures made by and through McHugh to the legislative committee. Judge King also found that, although the inquisition material left in the Attorney General's office by Kline was in boxes with address labels for McKinney, McKinney never received or saw that material.

Judge King also wrote in his report:

"158. It is reasonable to conclude that the initial failure to disclose in the Status and Disposition Report that WHCS records were being taken to Johnson County was not a deliberate attempt to deceive, or make misrepresentations to, Judge Anderson.

"159. Kline was not familiar with the content of the Status and Disposition Report. He was not even aware that Judge Anderson had requested an accounting for the location of the files. There is no indication that Maxwell advised Kline of the existence or content of the Status and Disposition Report.

"160. Maxwell was unaware that Kline had instructed Rucker on the morning of January 8, 2007, after the Status and Disposition Report had been submitted to Judge Anderson, to have the WHCS records copied and brought to Johnson County.

"161. Rucker took no steps to carry out the transfer of WHCS records to Johnson County before January 8, 2007.

"162. Rucker testified he always operated under the assumption that the records were transferred to the Johnson County District Attorney with the blessing of Attorney General Kline and Judge Anderson.

"163. Rucker is not aware of whether Maxwell knew of the idea of taking the WHCS records to Johnson County.

"164. Rucker does not recall ever telling Maxwell that the WHCS records were taken to Johnson County.

"165. Maxwell testified that at some time after January 8, 2007[,] he recalls talking to Kline about discussing the WHCS records with Judge Anderson. Maxwell does not recall that Kline specifically said that he told Judge Anderson that he took the WHCS records to Johnson County.

"166. Maxwell explains the failure of the Status and Disposition Report to disclose the transfer of WHCS records to Johnson County by stating that he did not know at the time he wrote the Report that the WHCS records were being taken to the Johnson County District Attorney's office. Subsequently, when he learned of such transfer he didn't advise Judge Anderson because he thought since Kline had been in almost daily contact with Judge Anderson the Judge must be aware

that Kline had the WHCS records in Johnson County. Also, Maxwell excuses his failure to correct or supplement the Report by stating that the Report was part of the inquisition and the inquisition was the Attorney General's and he wasn't with the Attorney General's office any longer.

"167. In his explanation Maxwell makes a number of assumptions about who knew what. What he did come to know as a fact was that he had authored a Report that was filed with the Court that was inaccurate. He had signed the Report. The Report contained his representation to the court of the disposition of the records and it was inaccurate. Once he learned that the report was inaccurate he did not take steps to correct it."

On May 2, 2008, we issued orders unsealing this action, with the exception of redactions made by this court. We expressly included the following language in the order in this case:

"The parties shall be responsible for making necessary redactions in any subsequent documents to protect pending prosecutions as well as the privacy of CHPP and WHCS patients. If redaction to accomplish these goals is not possible, the party shall file the entire document under seal. The redactions made by this Court in the previous documents and the [record of proceedings before Judge King] shall guide the parties in their decisions on redaction or sealing of subsequent documents. Information that must be redacted includes not only names of patients but also any other information about patients that could reasonably lead to their identities."

Similar language was contained in an order issued the same day in *State ex rel. Six v. Anderson,* the pending mandamus action concerning the Attorney General's access to inquisition materials.

In the May 2 order in this case, we also twice required Kline to file a copy of the written record of access to patient records that he had been ordered to maintain from October 5, 2007, forward; and we set a final briefing and argument schedule. The order's final sentence was: "Given Petitioner's prayer for an order to show cause why Respondent Kline should not be held in civil contempt, Kline is ordered to appear for oral argument in person."

After the parties submitted their final briefs but before oral argument, CHPP filed a motion to strike Kline's brief or, in the alternative, certain pages of it, and its attachments. Kline had included in his factual recitation an allegation that CHPP falsified certain documents. In support, Kline had attached certain redacted pages from confidential records of KDHE, which included gesta-

tional age, asserting that these records demonstrated the falsification. Kline's brief made no effort to explain any relationship of this allegation or its purported attached proof to the issues now before us. When his counsel was provided an opportunity to elaborate at oral argument, he also did not tie the allegation or attachments directly to the issues in this case. He insisted only that they provided necessary "context" for this court's consideration, apparently because of Kline's theory that CHPP is trying through this action to hamstring Kline's prosecution of it in Johnson County.

Also at oral argument, Kline took the offered chance to address this court personally, and he responded to the court's questions. He nevertheless repeatedly expressed a lack of preparation, asserting he had read the language in the court's May 2 order only to require him to be physically present in the courtroom rather than to be prepared to speak knowledgeably about his or his subordinates' conduct. He also described himself, at one point, as too busy discharging his obligations as the Johnson County District Attorney to address this matter. He expressed ignorance of the content of the record and said he had not reviewed his two sets of sworn written responses to this court's 17 questions. He stated he had never seen the written record of access to the patient records that this court had ordered him to maintain and then to file on two occasions. Kline also spontaneously defended the decision to attach the redacted KDHE records to his brief, not because they were necessary to provide this court with "context," as asserted by his counsel, but because he believed that they did not qualify as private medical records, that they were not subject to the safeguards delineated in our *Alpha* decision, and that similar information had previously been released by this court. He also attempted to argue the necessity of a subpoena he had sent to Judge Anderson, attempting to compel the judge to appear and produce records for use in the Johnson County prosecution.

Since oral argument, Kline filed a written response to CHPP's motion to strike. In it, he and counsel again make a context argument and again argue that the information discussed in his brief was contained in the public file of *State ex rel. Six v. Anderson* and that the attachments had been properly redacted to conceal any

nonpublic information. "Simply put," the response says, "Respondent deemed it necessary to present the information so that this court would be fully able to appreciate the extraordinary nature of the relief [CHPP] has asked it to grant." The response also challenges CHPP's assertion that Kline's brief violated K.S.A. 65-445(c), which restricts lawful access to confidential KDHE documents. Kline asserts:

"The information . . . and the exhibit did not reveal any information that was not already in the public realm, including the identity of [CHPP], which was publicly *revealed by* [*CHPP*] *itself* when it brought this mandamus action to have the records in question taken from [Kline]. Moreover, pursuant to the statute, the use of the information and exhibit was for the purpose of the pending criminal proceeding against [CHPP]. The criminal proceeding goes hand-in-glove with the mandamus action. For this court to reach a ruling on the mandamus action, it must understand the full context of the mandamus action in relation to the criminal prosecution. It simply cannot go overlooked that, as [CHPP] has been well aware all along, the records at issue in the mandamus proceeding are the vital evidence in the criminal proceeding and without which the criminal prosecution may end."

## Analysis

Based on our review of the entire record and the parties' most recent filings and oral argument, we first observe that CHPP's goals are substantially unchanged from those set out in its original June 2006 petition for writ of mandamus. In its May 29, 2007, brief, it urges this court to compel Kline to return all of the copies of the patient records to the Attorney General; to punish Kline for violating the mandate of *Alpha*; and to award it attorney fees and any other appropriate relief. CHPP has broadened its argument in support of the second goal, however, by urging that, in addition to or instead of finding Kline in contempt of *Alpha*, this court should find that he acted in "bad faith" meriting "sanction."

Kline counters that (1) the mandamus action is nonjusticiable and must be dismissed because (a) the clinic lacks standing, (b) its privacy argument is moot, and (c) mandamus is not an appropriate avenue for relief; and (2) petitioner is not entitled to the relief it seeks because (a) the order requested violates separation of pow-

ers, (b) *Alpha* is inapplicable to Kline, and (c) Kline is not and cannot be held in contempt of *Alpha*.

The Attorney General, now Six, characterizes the situation as one in which state property was unlawfully taken on Kline's exit from the office of the Attorney General. Before filing his most recent brief, the Attorney General had not attempted to use this case as a vehicle to obtain return of items other than patient medical records. He now seeks "each and every copy of those records that [Kline] has made and any and all other evidence Kline developed and obtained while he was acting as Attorney General that he took with him to Johnson County." These items include, as asserted at oral argument, any summaries Kline or his subordinates have created of WHCS patient records. We note that the Attorney General had earlier made an argument that, to the extent Kline performed or ordered conduct undertaken under the auspices of the Attorney General's office while Kline was Johnson County District Attorney, Kline violated the doctrine of incompatibility of offices. In essence, this argument is that Kline's one head cannot simultaneously accommodate two hats.

## Availability of Relief in District Court

Kline has argued that the relief CHPP and the Attorney General seek in this action is inappropriate because the petition fails to state why relief is unavailable in the district court. Kline apparently misreads Kansas Supreme Court Rule 9.01(a) (2007 Kan. Ct. R. Annot. 70), which states:

"Original jurisdiction of an appellate court will not ordinarily be exercised if adequate relief appears to be available in a district court. If relief is available in the district court, the petition shall state, in addition to all other necessary allegations, the reasons why the action is brought in the appellate court instead of in the district court. In the event the appellate court finds that adequate relief is available in the district court, it may dismiss the action or order it transferred to the appropriate district court."

The rule plainly requires the petition to state why original jurisdiction has been invoked only *if* relief is available in the district court. The record demonstrates that this is not the case here. On May 14, 2007, CHPP filed a motion requesting that Judge Ander-

son issue an order to show cause why Kline should not be held in contempt; an order directing Kline to surrender all copies of all patient records obtained through the inquisition; and an order directing Kline to appear and give an accounting under oath of disposition of the records. Judge Anderson denied the motion.

Moreover, Rule 9.01(a)'s permissive approach to exercise of this court's jurisdiction also is clear. Even if the record were not as explicit as it is on Judge Anderson's decision not to provide CHPP the relief it seeks, this court has discretion to exercise its original jurisdiction even if relief also is available in the district court.

Standing

Another of Kline's threshold legal arguments is that CHPP lacks standing to assert the constitutional privacy rights of its patients. In his view, the privacy of CHPP's patients was fully considered—and as protected as it can or should be—by our decision in *Alpha*, which directed CHPP and WHCS to redact patient-identifying information from the records before their production, even to Judge Anderson.

We agree that, insofar as the content of the records themselves is concerned, the clinics and their lawyers correctly bear the burden of their choices on which data they redacted from the records and which they did not. Our decision in *Alpha* did not restrict those choices, and neither CHPP nor the Attorney General has argued in this action that Judge Anderson or his appointed attorney or the physicians with whom the attorney consulted did so.

That being said, Kline's standing argument misses the mark. This action does not deal with the *content* of the records. We are now focused on Kline's *handling* of the records since *Alpha*. This handling includes, among other things, Kline's and his subordinates' comparison of the records to other materials to obtain adult patient names—a goal Rucker specifically denied when questioned during the oral argument in *Alpha*. And it includes the last-minute removal of the records from the Attorney General's office and the high, long lob through various automobiles and Reed's dining room that Kline and his subordinates used to ensure that the records would not arrive in the Johnson County District Attorney's office

before Kline and certain of his subordinates arrived. It also includes Kline's dissemination as Attorney General and Johnson County District Attorney of the records to various experts, and his inconsistent assertions of control and lack of control over the later dissemination of patient information by one of those experts. It includes Kline's and his subordinates' failure to correct the Status and Disposition Report and their creation and use of summaries of WHCS records that Judge Anderson ordered returned.

As in *Alpha*, CHPP has standing to attempt to neutralize the harms to its patients' constitutional privacy rights that Kline's behavior threatens. See *Alpha*, 280 Kan. at 921 (abortion providers can assert third-party standing to champion patients' rights to informational privacy) (citing *Singleton v. Wulff*, 428 U.S. 106, 117, 49 L. Ed. 2d 826, 96 S. Ct. 2868 [1976]; *Northwestern Memorial Hosp. v. Ashcroft*, 362 F.3d 923, 928 [7th Cir. 2004]; *Aid for Women v. Foulston*, 441 F.3d 1101 [10th Cir. 2006]). In order to invoke such standing, CHPP must allege "injury in fact," that is, "a sufficiently concrete interest in the outcome of their suit to make it a case or controversy" subject to this court's jurisdiction. *Singleton*, 428 U.S. at 112. It also must be the proper proponent of the particular legal rights on which it bases its suit. 428 U.S. at 112.

CHPP meets these criteria. Although the records have been redacted, they still contain information recognizable by certain persons other than the patients themselves and amenable to comparisons with other information sources that enable identification of patients by name. Despite Rucker's representation to the contrary, there was ample substantial competent evidence presented at the hearing before Judge King that Kline and his subordinates had used the records in exactly the latter endeavor and that they had disseminated the information capable of leading to such identifications to at least one expert witness who has since spoken publicly on patient information. These behaviors and other conduct of Kline and his subordinates demonstrate the existence of CHPP's standing to assert the privacy rights of its patients.

In addition, we observe that, although CHPP may no longer have a possessory interest in copies of patient records that may constitute evidence of its crimes, the Attorney General does. As Judge

Anderson recognized months ago, the inquisition that placed the records in the hands of law enforcement and prosecutors "belonged" to the Attorney General's office. The fruits of the inquisition were obtained through expenditure of personnel and other resources of that office's budget. Kline does not challenge the standing of the Attorney General in this action.

## Ripeness and Mootness

At various points in this case, Kline has argued that CHPP's claims were unripe and that they were moot. Following his logic as much as we are able, his idea of the appropriate point in time for vindication of a constitutional privacy right appears to be the instant it is invaded, not a nanosecond before or after. In other words, until actual invasion, any claim to protect the right is unripe; as soon as the invasion occurs, any claim to protect the right is moot.

We cannot agree with Kline's position. Although it is our function to determine real rather than speculative or abstract controversies, see *Smith v. Martens*, 279 Kan. 242, 244-45, 106 P.3d 28 (2005); *Blank v. Chawla*, 234 Kan. 975, 978, 678 P.2d 162 (1984) (citing *Anderson v. Carder*, 159 Kan. 1, 4, 150 P.2d 754 [1944]), the issue of whether Kline's and his subordinates' handling of the patient records threatens or invaded patients' privacy rights presents us with a real controversy. We must decide whether that handling constituted unlawful performance of a public duty or unlawful exercise of public office and whether Kline has engaged in contemptuous or otherwise sanctionable conduct.

## Separation of Powers

Kline also has argued that this action violates the doctrine of separation of powers. Evidently recognizing that the purpose of mandamus is court prevention and correction of unlawful performance of official duties or unlawful exercise of a public office, his separation of powers attack has now shifted to the relief sought by CHPP and the Attorney General. Kline avers that any relief this court could order in this case would inevitably run afoul of the doctrine of separation of powers because of his executive respon-

sibility for prosecution of crimes and, specifically, the fact that he launched such a prosecution against CHPP in Johnson County several months after this action was commenced.

We recognize that a county attorney or district attorney is the representative of the State in criminal prosecutions; and he or she has broad discretion in controlling those prosecutions. The scope of this discretion extends to the power to investigate and to determine who shall be prosecuted and what crimes shall be charged. *State v. Williamson*, 253 Kan. 163, 165, 853 P.2d 56 (1993) (citing *State v. Dedman*, 230 Kan. 793, 798, 640 P.2d 1266 [1982]; *State v. Blount*, 13 Kan. App. 2d 347, 351, 770 P.2d 852, *rev. denied* 245 Kan. 786 [1989]). It includes the power to dismiss charges; a court cannot refuse to allow a dismissal or restrain a prosecution. See *Williamson*, 253 Kan. at 166; *State ex rel. Miller v. Rohleder*, 208 Kan. 193, 195, 490 P.2d 374 (1971); *Foley v. Ham*, 102 Kan. 66, 67-72, 169 P. 183 (1917).

Nevertheless, a prosecutor's discretion is not limitless; and the doctrine of separation of powers does not prevent court intervention in appropriate circumstances. See *Alpha*, 280 Kan. at 918; *State ex rel. Cranford v. Bishop*, 230 Kan. 799, 800-01, 640 P.2d 1271 (1982). Kline conceded in *Alpha* and has conceded again here that courts must react when a prosecutor abuses the judicial process. And his counsel conceded at oral argument that courts routinely suppress evidence, dismiss charges, and reverse convictions when warranted by law enforcement or prosecutor actions.

In this case, Kline nevertheless insists that CHPP is merely trying to stymie his criminal case against it in Johnson County, improperly attempting to "pick its prosecutor" by forcing Kline to surrender the patient records to the Attorney General, who has exhibited no interest in filing charges. Kline is correct that, before Six took office, Morrison had issued a "no prosecution" letter to CHPP. As of this writing, Six has chosen to pursue a Morrison-generated, multiple-misdemeanor case against WHCS in Sedgwick County but has not begun any prosecution of CHPP.

Despite Kline's protestations, we are not persuaded that we are powerless to order relief if CHPP and the Attorney General prevail on the merits of their claim that Kline's and his subordinates' han-

dling of patient records constitutes unlawful performance of a public duty or unlawful exercise of public office because it invaded the privacy of individuals or was an unauthorized taking of state property. Among other things, it is significant that CHPP's filing of this original action predated Kline's Johnson County criminal case against CHPP by several months. In fact, although the evidence purportedly supporting the charges had been in Kline's possession for nearly a year, he did not file that criminal case until shortly after his and his subordinates' unorthodox movement of the patient records from the Attorney General's office to the Johnson County District Attorney's office came to the attention of this court by way of Morrison's filing of Reed's immunized sworn statement as an attachment to a pleading. At that point, Kline had an incentive to dissipate any light and heat directed at his conduct by this mandamus action.

Under these circumstances, we are unpersuaded by Kline's separation of powers argument. If his or his subordinates' behavior qualified as an unlawful performance of public duties or an unlawful exercise of one or both of his offices, this court may order relief to correct for it. The fact that such relief may have an impact on a different action, a criminal prosecution pending in a district court, simply is not logically or legally equivalent to the type of judicial branch interference in the performance of the executive prosecutorial function that we have previously disapproved. See *Rohleder*, 208 Kan. at 195. The doctrine of separation of powers does not pose an insurmountable obstacle to the pursuit of this action or to the relief sought by CHPP and the Attorney General.

The Merits and The Primary Relief Sought

Having disposed of all of the threshold issues raised by Kline, we now turn to the merits of the mandamus petition and Kline's continuing insistence that we dismiss it.

The Kansas Constitution provides this court with original jurisdiction for proceedings in mandamus. Kan. Const. Art. 3, § 3. In addition, K.S.A. 60-801 provides: "Mandamus is a proceeding to compel some . . . person to perform a specified duty, which duty results from the office, trust, or official station of the party to whom

the order is directed, or from operation of law." Relief in the nature of a writ of mandamus is discretionary. The burden of showing a right to the relief sought is on the petitioner. Unless the respondent's legal duty is clear, the writ should not issue. *State ex rel. Fatzer v. Salome*, 169 Kan. 585, 595, 220 P.2d 192 (1950); see *Alpha*, 280 Kan. at 918; S. Ct. Rule 9.01(a). Here, CHPP and the Attorney General claim that Kline's and his subordinates' handling of the patient records produced pursuant to *Alpha*, was unlawful, *i.e.*, in violation of a legal duty. If they have proved that Kline's behavior or that of those for whom he was responsible constituted unlawful performance of a public duty or unlawful exercise of a public office, we may grant them relief.

At this point, it is important to note what is *not* in dispute. CHPP and the Attorney General do not contend that an Attorney General lacks lawful authority to give information arising out of an investigation to others in a position to prosecute a lawbreaker. They also do not contend that a district attorney lacks authority to receive and act upon such information.

The nature of this dispute also renders irrelevant Kline's intermittent reliance on his interpretation of events to insist Judge Anderson had granted permission to "refer" the patient records from the Attorney General's office to the Johnson County District Attorney's office. Again, CHPP and the Attorney General realize, as they must, that referrals of information gathered in criminal investigations are neither uncommon nor inappropriate. They also know that such referrals do not generally require law enforcement or prosecutors to obtain permission from a member of the judiciary. The record demonstrates that Judge Anderson also appreciated this concept.

CHPP and the Attorney General do argue that there was no "other" to whom Kline as Attorney General gave the patient records at issue here, and that there was no "other" from whom Kline as Johnson County District Attorney received the records. This is true, in their view, no matter which of three possible factual scenarios occurred: (1) Kline's transformation from Attorney General to Johnson County District Attorney happened in an unimaginably brief instant, *i.e.*, there was no temporal gap and no temporal over-

lap between the time he left the first office and the time he took the second; (2) there was a gap between Kline's tenure as Attorney General and his tenure as District Attorney or between the employment of his subordinates by one office and the other; in this scenario, the records were unlawfully possessed and stored during that gap; or (3) there was an overlap between Kline's occupation of his statewide office and his district office or of his subordinates' employment by the first and then the second; in this scenario, the doctrine of incompatibility of offices controls and renders the possession and storage of the records during that overlap unlawful.

We are unpersuaded by the Attorney General's "no other" argument. It is obviously true that Kline is only one person. But he has held two different public offices, the first via a statewide election not challenged here and the second through a Republican precinct committee selection process not challenged here. As mentioned above with regard to the sufficiency of Kline's sworn responses to this court's 17 factual questions, he is not involved in this action nor is his conduct under our scrutiny because of who he is as a person, but because of the offices he occupied at the time of the subject events.

The rub here is that, as Judge King recognized, Kline's movement and storage of the patient records from the Attorney General's office to the Johnson County District Attorney's office was far from typical in timing and method. It also was far from typical because of the unique exchange of prosecutorial offices by Kline and Morrison and the intense political acrimony that surrounded it. Certain other aspects of Kline's handling of these sensitive patient records also were well short of responsible. For example, he should have independently seen to it that a written log of access to the records was consistently and completely maintained, particularly in light of this court's emphasis on their privacy implications in *Alpha*. To the extent comparison of information from various sources could reveal patient identities, he should have ensured that those to whom the records were to be shown or their contents to be revealed or described were committed in writing beforehand to appropriate confidentiality. The extended time the records spent in Reed's unsecured dining room was nothing short of grossly in-

competent. Kline's and his lawyer subordinates' statements to the public, press, Judge Anderson, and this court may yet subject them to disciplinary sanction. But our task at this moment is to determine whether mandamus is the appropriate avenue to relief in this action and, if so, the specific relief it supports.

Judge King did not make an explicit finding of fact on which of the three possible factual scenarios regarding Kline's transition existed—whether he simultaneously exited the Attorney General's office and entered the Johnson County District Attorney's office, whether there was a gap between Kline's tenures, or whether there was an overlap. Our detailed review of the record does not establish the precise timing of Morrison's swearing-in as Attorney General or Kline's swearing-in as Johnson County District Attorney. In Kline's own testimony before Judge King, he asserted that there was approximately an hour of overlap in his two offices—from his swearing-in as Johnson County District Attorney until Morrison's swearing-in as Attorney General. Neither CHPP nor the Attorney General appear to take serious issue with that assertion. We thus address the third possible factual scenario and the doctrine of incompatibility of offices.

The first Kansas case to discuss the common-law doctrine of incompatibility of office was *Abry v. Gray*, 58 Kan. 148, 48 Pac. 577 (1897). It recognized that incompatibility of function underlay the common-law doctrine. *Abry*, 58 Kan. at 149 (quoting *People, ex rel. Ryan v. Green*, 58 N.Y. 295, 304 [1874]); see also *Congdon v. Knapp*, 106 Kan. 206, 207, 187 Pac. 660 (1920) (holding offices of assistant chief food and drug inspector and hotel commissioner not incompatible). In *Dyche v. Davis*, 92 Kan. 971, 978-79, 142 Pac. 264 (1914), this court extended the incompatibility doctrine to holding position of public office and job as state employee. And, recently, in *U.S.D. No. 501 v. Baker*, 269 Kan. 239, 247-53, 6 P.3d 848 (2000), this court applied the doctrine to hold that a teacher's acceptance of a position on the local board of education resulted in an ipso facto forfeiture of her position as a teacher.

Kansas has not dealt with facts similar to those raised in this case. We have found only one other appellate court has examined an issue involving its state Attorney General. See *State ex rel. Tho-*

*mas v. Wysong,* 125 W. Va. 369, 373, 24 S.E.2d 463 (1943) (no incompatibility between office of Attorney General of West Virginia and commissioned officer in United States Army; duties not inconsistent and so divergent there is no incompatibility; "[I]ncompatibility [of offices] rests not upon physical inability to perform the duties of both offices, but arises from the inconsistent nature of the offices and their relation to each other, rendering it improper, from considerations of public policy for one person to perform the duties of both").

The statutes governing the duties of the position of the Kansas Attorney General are contained in K.S.A. 75-701 *et seq.,* and the provisions governing the duties of the position of county and district attorneys are contained in K.S.A. 22a-101 through 22a-109. See also KRPC 3.6 (2007 Kan. Ct. R. Annot. 570) (trial publicity); KRPC 3.8 (2007 Kan. Ct. R. Annot. 525) (special responsibilities of a prosecutor as advocate). The only apparent potential for conflict we discern is the Attorney General's statutory duty to provide "aid to county attorneys," *i.e.,* to "consult with and advise county attorneys, when requested by them, in all matters pertaining to their official duties." K.S.A. 75-704. Such a conflict did not materialize in this case. If anything, Kline's movements of the patient records and other inquisition materials from one office to another appear to constitute aid, consultation, or advice to the Johnson County District Attorney rather than their opposites.

As the Attorney General points out, however, it is undisputed that the second factual scenario, a gap between employments or occupation of official position, existed for investigators Williams and Reed. Their employment with the Attorney General's office ended no later than the time of Morrison's swearing-in on the morning of January 8, 2007, and their employment with the Johnson County District Attorney's office began no earlier than the following morning. Thus, to the extent they were engaged in movement or storage of the patient records during the intervening time period, which both they and Kline admit, they were engaged as private citizens with no public authority whatsoever. The Attorney General argues that this engagement was unlawful.

We disagree. CHPP and the Attorney General admit, as Judge King found, that there are no binding standards for exactly how to effect an exchange of investigation information between prosecutors. There may be generally accepted professional patterns, and certainly attorney ethics rules establish a floor below which prosecutor behavior may not sink without risk of discipline. Kline's long lob, enabling himself and his subordinates to play both sides of the net, was, at a minimum, unorthodox. At a maximum, it was cynically calculated not only to facilitate Kline's ability to continue his pursuit of CHPP and WHCS despite his rejection by the statewide electorate but also to defeat or delay any review of the legal justification of that pursuit by a political nemesis whom the same electorate had selected as Kline's successor. But the long lob was not illegal. And, there is no law preventing prosecutors from allowing private citizens to have a role in the transport and storage of inquisition documents.

Moreover, CHPP is incorrect when it asserts that our *Alpha* decision required the patient records not to leave the Attorney General's office. Our direction that the records, after redaction by the clinics and Judge Anderson's appointed lawyer and consultant doctors, be "turned over to the Attorney General," 280 Kan. at 925, simply had nothing to do with what happened to the records after that point. *Alpha* was not intended to instruct and did not instruct on whom Kline should or should not involve in any other aspect of his investigation; whether referrals should be made to other prosecutors; if so, which prosecutors would be acceptable; whether confidentiality agreements should be required of potential witnesses with whom the records' contents were shared; how the records were to be stored; or how access to them was to be documented. In short, any inherent prosecutorial power to transmit information to other prosecutors that Kline possessed the day before *Alpha* was filed he still possessed the day after. See *State v. Williamson*, 253 Kan. 163, 165, 853 P.2d 56 (1993). And no law prescribed exactly how he was to go about it.

The Attorney General's argument that Kline unlawfully removed personal property of the Attorney General's office also is not persuasive. The Attorney General relies on three cases—*Huffman v.*

*Mills*, 39 Kan. 577, 18 Pac. 516 (1888); *State v. Lawrence*, 76 Kan. 940, 92 Pac. 1131 (1907); *State ex rel. Terrell v. Thompson*, 135 Kan. 193, 9 P.2d 628 (1932)—for the proposition that mandamus is appropriate to compel a former public officer to return property belonging to the office. But these cases are fatally distinct.

In *Huffman*, the petitioner was a successor sheriff who named his predecessor as respondent. The respondent retained property belonging to the office, arguing the petitioner was not qualified to be sheriff because of a failure to canvass election returns. This court held that petitioner took office upon filing of his oath and bond and agreed that an action in mandamus or quo warranto was appropriate to compel respondent to deliver the property of the office to his successor. See 39 Kan. at 578-79. In *Lawrence*, the district court had issued a judgment on a dispute over the legal holder of the office of county treasurer. The execution of the judgment had not been stayed. We held that mandamus was appropriate to compel the delivery of the money, books, and records of the office to the person adjudged to be elected. See 76 Kan. at 944. The *Thompson* case also involved a treasurer's retention of money, books, and records. In that action, this court approved mandamus to force return of these items to the new treasurer of the township. See 135 Kan. at 194-95. None of these cases controls here because none involves a situation in which the former public officeholder is also a current officeholder with authority to possess the materials at issue. In *Huffman, Lawrence*, and *Thompson*, the continued possession by the former officeholder was entirely without legal support. In sum, the person who holds the position of Johnson County District Attorney may lawfully possess the results of a criminal investigation begun by the Attorney General. An Attorney General or a district attorney may use a private citizen to ferry results of a criminal investigation, *e.g.*, Williams and Reed during the period between employment by the Attorney General's office and employment by the District Attorney's office. To the extent Kline eventually seeks to admit in any criminal prosecution any of the records he and his subordinates and/or private citizens moved from one office to the other, his choices may have exposed

that evidence to challenge; but that is an argument for another day in another case.

The above analysis leads us to the conclusion that CHPP and the Attorney General are not entitled to the primary relief they seek. We will not force Kline to disgorge "each and every copy" of the patient records Kline and his subordinates have made "and any and all other evidence Kline developed and obtained while he was acting as Attorney General that he took with him to Johnson County." However, as discussed below, this matter does not end there.

## Other Appropriate Relief

The record before us demonstrates that Kline and his subordinates did not merely take copies of patient records and some or all of the work product they generated in the inquisition while Kline held the position of Attorney General. They took *all* copies of the patient records and certain other materials as well. Even if the unique circumstances of this case compel us to conclude that Kline was not prevented by law from moving the patient records to the Johnson County District Attorney's office, that does not mean he was entitled to ensure that no coherent copies of these records or of other investigation materials were left behind. Indeed, we cannot condone his effort to stand in the way of his successor doing his job.

As referenced briefly above, the patient records at the heart of this case and any and all other inquisition materials gathered or generated by Kline and/or his subordinates during the time he was Attorney General were gathered or generated through expenditure of state taxpayer dollars that flowed into the Attorney General's budget for salaries and expenses. The state's taxpayers, in the person of the current Attorney General, are entitled to a full, complete, and understandable set of those materials.

We therefore hereby order the following relief:

Kline shall produce and hand deliver to the Attorney General's office no later than 5 p.m. on December 12, 2008, a full, complete, and understandable set of the patient records and any and all other materials gathered or generated by Kline and/or his subordinates

in their abortion-related inquisition while Kline was Attorney General. Neither Kline nor any of his subordinates or lawyers may make any exceptions whatsoever for an reason or on any rationale to the foregoing order. "Full, complete, and understandable" means exactly what it says. This set of materials shall be organized and labeled exactly as organized and labeled in the files or repositories maintained by and/or for Kline and his subordinates in the discharge of their duties on behalf of the Johnson County District Attorney's office. The cost of the production and delivery of the set of materials described in this paragraph shall be borne by the Johnson County District Attorney's office.

## Civil Contempt under *Alpha*

CHPP has also asserted that this court should hold Kline in contempt because his behavior violated the mandate of *Alpha* by failing to ensure "a specific written protective order was . . . in place," which led to copying and dissemination without chain of custody or accountability, unrestricted access, and misuse. CHPP also asserts that Kline's handling of the records failed to comply with privacy protections mandated by United States and Kansas Constitutions. We interpret CHPP's prayer for relief in this action to refer to civil rather than criminal contempt.

Civil contempt is the failure to do something ordered by the court for the benefit or advantage of another party to the proceeding. *State v. Davis*, 266 Kan. 638, Syl. ¶ 2, 972 P.2d 1099 (1999); *Edmiston v. First Nat'l Bank of Holcomb*, 242 Kan. 13, 15, 744 P.2d 829 (1987). A proceeding in civil contempt is remedial in nature, designed to advance the private right of a litigant won by court order. *Alpha*, 280 Kan. at 927; *Davis*, 266 Kan. 638, Syl. ¶ 2; *Campbell v. Campbell*, 198 Kan. 192, 193, 422 P.2d 941 (1967). Any penalty inflicted for civil contempt is intended to be coercive, and relief can be achieved only by compliance with the order. 198 Kan. at 193-94; *Hendrix v. Consolidated Van Lines, Inc.*, 176 Kan. 101, 109, 269 P.2d 435 (1954); see also *State v. Jenkins*, 263 Kan. 351, 358, 950 P.2d 1338 (1997); *Krogen v. Collins*, 21 Kan. App. 2d 723, 726, 907 P.2d 909 (1995). In other words, a sentence imposed for civil contempt must permit the contemnor to "unlock

the door of the . . . jail and discharge herself by doing what she has previously failed to do." *In re Conservatorship of McRoy*, 19 Kan. App. 2d 31, 34, 861 P.2d 1378 (1993).

We have already stated above that *Alpha* did not deal with the handling of the records once they reached the Attorney General's office. It dealt with safeguards for patients' constitutional privacy interests and the balance between those interests and the pursuit of Kline's criminal investigations. It dealt with the steps Judge Anderson was required to follow to manage the production of the records in response to inquisition subpoenas; it did not deal with the use of the records by prosecutors after that point.

It is true, as CHPP has emphasized, that our *Alpha* opinion also urged all sides to be sensitive to the confidential nature of the information in the records and the imperative of secrecy in investigations and to therefore limit their public statements. In its penultimate paragraph, we stated: "We caution all parties to resist any impulse to further publicize their respective legal positions, which may imperil the privacy of the patients and the law enforcement objectives at the heart of this proceeding." 280 Kan. at 930.

Despite Kline's repeated invocations of the importance of patient privacy, his conduct evidences little or no respect for it. His decision to appear on "The O'Reilly Factor" and his facilitation of McHugh's interview are merely the most obvious examples of his pattern of willful disregard for the spirit that animated this court's careful balance of patients' constitutional privacy rights and the compelling state interest in criminal investigation articulated in *Alpha*. And these and other instances of his conduct raise troubling questions about Kline's and any other involved lawyer's compliance with the Kansas Rules of Professional Conduct—particularly KRPC 3.8, which specifically governs prosecutors and with which Kline expressed complete unfamiliarity at oral argument before this court.

That much being said, we do not at this time deem it advisable to institute a proceeding against Kline for indirect civil contempt under K.S.A. 20-1204a. He has not persuaded us that such an action will never be appropriate, particularly if additional or amplifying information should come to light about his behavior since

October 24, 2006, when the patient records came into his possession as Attorney General. Our reluctance to pursue an indirect civil contempt proceeding today is in part a reflection of our decision not to grant the primary relief sought on the merits, as well as a recognition that the letter of *Alpha* was directed at Judge Anderson rather than Kline. This reluctance should in no way be interpreted as approval of Kline's attitude or behavior to this point. Indeed, we note that, during Judge Anderson's testimony before Judge King, Kline's counsel inquired whether it would be "fair to say" that "Kline has not been contemptuous of any of your orders." Judge Anderson's response was that he had not found Kline in contempt. This was artfully put. Judge Anderson did not accede to counsel's effort to obtain his endorsement of Kline's attitude and behavior. Neither do we.

Attorney Fees and Sanctions

We now address attorneys fees and sanctions.

Because the primary relief sought by CHPP and the Attorney General has been denied, we also hold that they are not entitled to recovery of attorneys fees.

Turning to sanctions, CHPP calls for this court to impose sanctions on Kline for bad faith conduct. Again, it focuses on Kline's movement of the records from the Attorney General's office to the Johnson County District Attorney's office and on what it views as his responsibility for inadequate controls by Judge Anderson on access and dissemination of the records and their content once they were in Kline's hands.

For all of the reasons already discussed, we are unwilling to impose sanctions on Kline for the conduct on which CHPP focuses. However, we agree that other behavior by Kline and by subordinates, for whom even he admitted at oral argument he must bear responsibility, merits sanction by this court. We have inherent power to sanction behavior, not denominated contempt and absent particular statutory authorization, because sanction is "reasonably necessary for the administration of justice, provided these powers in no way contravene or are inconsistent with substantive statutory law." *Wilson v. American Fidelity Ins. Co.*, 229 Kan. 416, 421, 625

P.2d 1117 (1981); see *Alpha*, 280 Kan. at 926; compare K.S.A. 60-237 (sanctions permitted for civil discovery violations); K.S.A. 60-211(b), (c) (civil pleadings, motions, other papers meriting sanction); K.S.A. 22-3212(g) (sanctions available for discovery violation in criminal cases). Several of our sister jurisdictions have recognized inherent power or discretion to sanction. See *Ferguson v. Keays*, 4 Cal. 3d 649, 94 Cal. Rptr. 398, 484 P.2d 70 (1971) (the Supreme Court and courts of appeal possess the inherent power, discretion to impose appropriate sanctions); see also *State ex rel. Richard v. Cuyahoga Cty. Commrs.*, 100 Ohio App. 3d 592, 597, 654 N.E.2d 443 (1995); *Pruett and Pruett*, 185 Or. App. 669, 677, 60 P.3d 1094, *rev. denied* 335 Or. 443 (2003); *In re Moore*, 235 S.W.3d 210 (Tex. 2007).

The record before us discloses numerous instances in which Kline and/or his subordinates seriously interfered with the performance of his successors as Attorney General and seriously interfered with this court's effort to determine the facts underlying this action and the legal merit of the parties' positions.

Kline was demonstrably ignorant, evasive, and incomplete in his sworn written responses submitted to Judge King, this court's appointed agent in the fact-finding process. Kline's responses were far from full and forthright; they showed consistent disregard for Kline's role as a leader in state law enforcement; and they delayed and disrupted this court's inquiry. Among other things, he failed to consult with subordinates as appropriate to give responses, treating questions posed to him as a public servant whose conduct was under scrutiny in a mandamus action as though they were questions posed to him as an uncooperative and too-clever-by-half private litigant. He was thorough only when digressing from the point.

Kline's approach persisted during his examination as a sworn witness in the hearing before Judge King. It was not fully corrected in Kline's supplemental written responses submitted on order of Judge King; and he returned to it in his appearance before this court at oral argument.

Furthermore, when Kline's behavior has been questioned, he has hustled to deflect responsibility and any attendant blame. Kline denied knowledge of the content of Williams' affidavit before it

was filed in support of the December 2006 charges in Sedgwick County. He attempted to sidestep accountability for the uncorrected Status and Disposition Report. He denied ever looking at the written record of access to the patient records this court directed him to maintain and file even though that would have been vital to his ability to sign his sworn supplemental responses to this court's 17 fact questions.

Regrettably, we note Kline's example appears to have influenced his subordinates. The record demonstrates that Rucker attempted to minimize his familiarity with *Alpha*, although he appeared before this court to argue it. Maxwell also attempted to avoid his responsibility to correct the Status and Disposition Report he had drafted and given to Judge Anderson by saying he was no longer involved in Kline's abortion-related investigation once it moved to Johnson County.

With regard to Kline's responses to this court's 17 fact questions, we also note that, when we asked for legal authority for his behavior, Kline said only that one subordinate, Maxwell, had obtained permission to obtain a copy of certain information from another subordinate, Rucker. Yet Kline admitted at oral argument before us that it would not be appropriate for him simply to invoke Rucker as legal authority in a brief or oral argument to this court in a criminal case prosecuted by his office. Kline apparently felt free to treat this original action in the Kansas Supreme Court less conscientiously.

We are also deeply disappointed by Kline's casual treatment of the WHCS patient records. First, he moved them to the Johnson County District Attorney's office, despite the clinic's location in Sedgwick County. Second, he and Maxwell failed to correct the Status and Disposition Report given to Judge Anderson on this point. Even accepting, as we do, Judge King's factual finding that no initial deception or misrepresentation was intended, the same cannot be said about Maxwell's, and thus Kline's, subsequent failure to set the record straight. Once Judge Anderson discovered that Kline had possession of the WHCS records, he demanded that the records be returned and questioned whether copies had been kept. He was told no. Yet Kline's sworn responses to the 17 fact

questions reveal that Kline and his subordinates failed to disclose to Anderson that certain summaries of the WHCS records had been created and maintained. By the time Kline appeared before this court for oral argument, he again expressed uncertainty as to whether the summaries existed or were in the possession or use of his office.

Kline has demonstrated similarly disingenuous and possibly orchestrated confusion on his status vis a vis McHugh. After Kline was defeated in the Attorney General's race but before he decamped to Johnson County, he embraced McHugh long enough to ensure that McHugh obtained redacted copies of patient records and other items that could enable patient identification. Kline later disavowed any ability to control McHugh's behavior when McHugh discussed the contents of the records in an interview sponsored by an anti-abortion advocacy group. Kline's behavior told a different story. He met with McHugh shortly before McHugh's interview and listened to the interview as it was being conducted, both ostensibly because he was concerned about patient privacy. Still later, Kline personally typed an overinclusive affidavit for McHugh at the request of Judge Anderson. Although Kline did not, as Judge King found, personally pass that affidavit on to a legislative committee, he contributed without reason to the detail ultimately revealed by McHugh and others.

An obvious and sorry pattern emerges from the foregoing examples and from Kline's performance at oral argument before us. Kline exhibits little, if any, respect for the authority of this court or for his responsibility to it and to the rule of law it husbands. His attitude and behavior are inexcusable, particularly for someone who purports to be a professional prosecutor. It is plain that he is interested in the pursuit of justice only as he chooses to define it. As already noted in *Alpha*, he has consistently disregarded the clear import of this court's directions, instead doing what he chose because "he knew best how he should behave, regardless of what this court had ordered, and [believed] that his priorities should trump whatever priorities this court had set." *Alpha*, 280 Kan. at 929.

We note that Kline has persisted in his attitude and behavior despite the fact that *Alpha* made clear that he had already narrowly

escaped a contempt citation. He has repeatedly maximized jeopardy to *Alpha*'s delicate balance between abortion patients' constitutional privacy rights and law enforcement interests. We therefore conclude that sanction is necessary to remediate the substantial actual costs the Attorney General's office and this court have incurred as a result, to discourage Kline from continuing as he has, and to deter his subordinates and successors from following his example.

In light of all of the foregoing and because Kline and his subordinates have, during their time in Johnson County, capitalized on what they learned while Kline was Attorney General, we hereby order the following sanction:

Kline shall produce and hand deliver to the Attorney General's office no later than 5 p.m. on December 12, 2008, a full and complete and understandable set of any and all materials gathered or generated by Kline and/or his subordinates in their abortion-related investigation and/or prosecution since Kline was sworn in as Johnson County District Attorney. Neither Kline nor any of his subordinates or lawyers may make any exceptions whatsoever for any reason or on any rationale to the foregoing order. "Full, complete, and understandable" means exactly what it says. This set of materials shall be organized and labeled exactly as organized and labeled in the files or repositories maintained by and/or for Kline and his subordinates in the discharge of their duties on behalf of the Johnson County District Attorney's office. The cost of the production and delivery of the set of materials described in this paragraph shall be borne by the Johnson County District Attorney's office.

We also hereby order as an additional sanction that Kline, Rucker, Maxwell, Williams, Reed and any other employee of the Johnson County District Attorney's office requested by the Attorney General shall meet with the Attorney General and/or his designee(s) on whatever date(s) and at whatever time(s) designated by the Attorney General up to and including noon on January 10, 2009, and at whatever place(s) designated by the Attorney General for the purpose of explaining all of the materials turned over by 5

p.m. on December 12, 2008, pursuant to the relief and sanction orders contained in this decision by this court.

## Motion to Strike

Kline and his counsel's principal explanation for why Kline's final brief in this mandamus action discussed his allegations in the Johnson County criminal case against CHPP and why he decided to attach redacted copies of confidential KDHE records is unfortunately reminiscent of Kline's initial troubling response to the contempt allegation in *Alpha*. Essentially, to Kline, the ends justify the means. The explanation is also entirely unconvincing.

In our view, neither Kline nor his counsel can seriously believe that without the disputed portion of their brief or the attachments, we would have been unaware of the chronology or context of events underlying this case or of the potential of any relief we grant to affect the Johnson County criminal case. Litigation among these parties has been ongoing for years. Accordingly, we must conclude that this explanation is yet another *post hoc* rationalization for conduct designed to poison the well of public and judicial opinion about CHPP. Kline's adoption of this tactic is not new but it is transparent. Again, Kline attempts to invoke his (irrelevant) opinion about the strength of his criminal case to defeat any criticisms of his choices in how to pursue it.

We also agree with CHPP that Kline's and his counsel's attachment of the KDHE records may have run afoul of K.S.A. 65-445(c). As with certain other issues, we leave resolution of that issue to another case on another day.

Finally, we also reject assertions by Kline and his counsel that the previous statements or actions of this court justified the content of or attachments to the brief. This court engaged in an enormously costly and careful redaction of the public files in this action and in *State ex rel. Six v. Anderson*. We were explicit in announcing that the parties should be guided by our redactions. As in *Alpha*, Kline simply believed he knew better than this court and the legislature what he should and should not include.

In view of the above, we grant CHPP's motion to strike as to the attachments to Kline's brief. This court has disregarded the portion of the brief to which CHPP objects.

Because Kline's actions also seriously interfered with this court's efforts to determine the facts and arrive at resolution, we also regard reimbursement of this court for the costs of this action in the amount of $50,000—*i.e.*, the minimum personnel expense associated with filings, hearings, and conferences that could have been avoided if Kline's conduct had been otherwise—to be an appropriate additional sanction. However, were we to impose this sanction, it would be borne by Johnson County rather than Kline personally. We are unwilling to make those taxpayers foot any further bill for the conduct of a district attorney they did not elect in the first place and have now shown the door.

### Conclusion

We believe the limited relief granted and the sanctions imposed above strike a moderate and reasonable balance among the interests of the parties to this action, as well as those of the patients whose privacy rights are at stake, and the citizens of this state who have a right to expect lawful, ethical, and professional behavior from their elected and appointed public servants. We appreciate the delicacy of the intersection between this action and others now pending or to be brought in the future. We are saddened but satisfied that the combination of relief and sanctions selected will ameliorate the most grievous harms still amenable to such treatment and remove all incentive for further inappropriate behavior that this court is capable of removing.

We also note, as referenced above, that further instances of Kline's improper conduct or the improper conduct of subordinates for whom he bears responsibility may yet come to light. Such actions, standing alone or when considered alongside Kline's or others' conduct in *Alpha* and/or in this case may merit civil or criminal contempt, discipline up to and including disbarment, or other sanctions. Furthermore, the known pattern of obstructive behavior prompting sanctions, standing alone, may be or become the subject of disciplinary or other actions; a copy of this opinion will be forwarded to the disciplinary administrator. We rule today only on the appropriateness of sanctions in this case because of the currently known components of obstructive behavior regarding this

matter. We do not address other issues or potential issues in other actions.

Petition for writ of mandamus is granted in part and denied in part, and sanctions are imposed as more fully set out in the foregoing opinion.

IT IS SO ORDERED.

DAVIS, J., concurring: I concur in the result and agree with the majority opinion that the issue before us is District Attorney Phill Kline's handling of the records since our decision in *Alpha Med. Clinic v. Anderson*, 280 Kan. 903, 128 P.3d 364 (2006). Our concern in this case has been and is the "constitutional privacy rights that Kline's behavior threatens." 287 Kan. at 406. I disagree with the majority's analysis on two specific points: (1) the majority's implicit finding that Kline's actions constituted the unlawful performance of a public duty or unlawful exercise of public office; and (2) the majority's characterization of the relief granted against Kline as sanctions rather than an order of mandamus.

First, I disagree with the portion of the majority opinion that concludes in the context of its "ripeness and mootness" discussion that "[w]e must decide whether that handling [of the records] constituted unlawful performance of a public duty or unlawful exercise of public office." 287 Kan. at 407. The majority uses the phrases "unlawful performance" and "unlawful exercise" numerous times throughout its opinion to describe Kline's conduct at issue in this case.

The majority acknowledges that Judge David King, who was appointed by this court as a special master to conduct an evidentiary hearing and make factual findings on the handling of the record, reported that the handling of the records was not done in an "ordinary manner" and that " 'the exchange of records in this case was handled differently than any other such information exchange described by any other witnesses.' " 287 Kan. at 399. Despite these observations, Judge King concluded and the majority concurred that there were "no written protocols or procedures for exactly how prosecutors are to go about sending investigation materials from one office to another." 287 Kan. at 399.

Because there is no statutory definition of "unlawful perform-ance of a public duty or unlawful exercise of public office," and given that we have determined that the handling of the records "was not illegal," 287 Kan. at 414, as there are no laws, protocols, or procedures for how prosecutors should transfer investigation materials to other prosecutors' offices, I do not think we are in a position to make a determination as to whether Kline or his em-ployees engaged in the "unlawful performance of a public duty or unlawful exercise of public office." We are only in a position to determine whether his handling of the records as outlined in the majority opinion violated the constitutional privacy rights of pa-tients.

Second, I would not classify the relief granted against Kline and his employees as sanctions. Rather, this court is in a position in a mandamus action to require a public official to perform his or her duty. See K.S.A. 60-801 ("Mandamus is a proceeding to compel some inferior court, tribunal, board, or some corporation or person to perform a specified duty, which duty results from the office, trust, or official station of the party to whom the order is directed, or from operation of law."). When Kline removed records from the Attorney General's office leaving no copy for the incoming Attor-ney General, he made it difficult if not impossible for the incoming Attorney General to determine his course of action regarding the information within those records. Thus, the relief granted by the majority opinion is appropriate in that the relief directs a public official to perform his duty and restore to the present Attorney General what is rightfully his. Accordingly, I would hold that it is proper, through mandamus, to compel Kline to perform that duty. *Cf., State, ex rel. v. Thompson*, 135 Kan. 193, 9 P.2d 628 (1932) (mandamus appropriate to compel delivery of property of county treasurer's office); *State v. Lawrence*, 76 Kan. 940, 92 Pac. 1131 (1907) (mandamus appropriate to compel delivery of property of county treasurer's office); *Huffman v. Mills*, 39 Kan. 577, 18 Pac. 516 (1888) (property belonging to sheriff's office ordered delivered in mandamus action).

The majority opinion's imposition of sanctions against Kline for his actions before this court presents a problem. While I recognize

that this court possesses inherent power to impose sanctions in cases falling short of civil or criminal contempt, our exercise of that power must nevertheless be measured by objective standards. The fundamental problem with the majority's decision to impose sanctions in this case is that there is no objective test—statutory or otherwise—by which the court can measure Kline's conduct and by which attorneys can avoid such penalties in the future.

A court exercising its inherent powers to sanction "must comply with the mandates of due process." *Chambers v. NASCO*, 501 U.S. 32, 50, 115 L. Ed. 2d 27, 111 S. Ct. 2123 (1991). It is a fundamental principle of due process that " '[a]ll are entitled to be informed as to what the State commands or forbids.' " *Chambers*, 501 U.S. at 68 (Kennedy, J., dissenting) (quoting *Lanzetta v. New Jersey*, 306 U.S. 451, 453, 83 L. Ed. 888, 59 S. Ct. 618 [1939]). The due process concept of notice requires that a law "convey[] a sufficiently definite warning of the proscribed conduct" so that those subject to it have the opportunity to conform their conduct accordingly. *In re Comfort*, 284 Kan. 183, 199, 159 P.3d 1011 (2007) (vagueness challenge to Kansas Rule of Professional Conduct). See also *Grayned v. City of Rockford*, 408 U.S. 104, 108, 33 L. Ed. 2d 222, 92 S. Ct. 2294 (1972) (laws must "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly" and "provide explicit standards for those who apply them" so as to avoid arbitrary and discriminatory application). Thus, due process requires that a court-imposed standard of conduct be sufficiently clear so that attorneys have the opportunity to comply with the standard and the court may uniformly apply the standard. Once it is determined that counsel's action has fallen below this standard the imposition of sanctions is discretionary.

The majority relies upon *Wilson v. American Fidelity Ins. Co.*, 229 Kan. 416, 421, 625 P.2d 1117 (1981), and *Knutson Mortgage Corp. v. Coleman*, 24 Kan. App. 2d 650, Syl. ¶ 1, 951 P.2d 548 (1997), as support for its exercise of our inherent powers in this case. In both of these cases, however, the court's inherent powers were used to sanction conduct that ran afoul of *specific statutory provisions*. See *Wilson*, 229 Kan. at 418; *Knutson Mortgage Corp.*, 24 Kan. App. 2d at 653. In each of these two previous cases, the

court used its inherent powers "as a means of enforcing obedience to a law which the court is called on to administer." *Wilson,* 229 Kan. at 421. The circumstances giving rise to those cases are in sharp contrast to the case presently before us, where the majority is not measuring counsel's action against any statute, rule, or other established standard, except to say that counsel Kline has not treated this action or this court with the respect demanded in such a proceeding.

It seems to me that the standard imposed by the court in this case is a standard the court exacts. Under such circumstances a respondent has no standard or rule by which he or she may gauge his or her action. As the United States Supreme Court has cautioned, courts "must be on guard against confusing offenses to their sensibilities with obstruction to the administration of justice." *Brown v. United States,* 356 U.S. 148, 153, 2 L. Ed. 2d 589, 78 S. Ct. 622 (1958) (criminal contempt case).

I am not unmindful of what the facts in this record demonstrate, but I believe the same result may be reached in granting relief without the resort to sanctions. Because of their very potency, inherent powers must be exercised with restraint and discretion. *Chambers,* 501 U.S. at 44. In that light, we should refrain from imposing sanctions under our inherent powers to punish for bad faith conduct where that conduct can be adequately sanctioned under other rules or procedures. See 501 U.S. at 50.

The facts—without any inferences—speak for themselves concerning the performance of Kline and his employees. I would not attempt to characterize those actions in handling these records and responding to the investigation of this court, as the record speaks loud and clear. I would therefore leave the matter in the hands of the Disciplinary Administrator for an independent judgment as to whether ethical violations have occurred during the course of these proceedings. Otherwise, I agree with the disposition of this case.

McFARLAND, C.J., concurring in the result: I join Justice Davis' opinion which also concurs in the result.

I agree with Justice Davis that the relief granted in this case is appropriate. As Justice Davis explained, Kline's failure to leave a

complete set of records and investigative materials for the incoming Attorney General hampered his successor's ability to determine his course of action with regard to the investigation. Accordingly, requiring Kline and his employees to provide the Attorney General with a full and complete set of all of the records and investigative materials gathered or generated by Kline and his employees in the abortion-related investigation while he was the Attorney General and during his tenure as the Johnson County District Attorney is warranted. However, I strongly disagree with characterizing this relief as a sanction imposed under our inherent power to sanction bad faith conduct.

First, as Justice Davis explains, the order directing Kline—a public official—to perform his duty and restore to the present Attorney General copies of the records to which he is rightfully entitled is wholly consistent with the type of relief available in mandamus. Moreover, as the majority even notes, it is the very relief requested by the Attorney General. Lastly, as noted above, it is decidedly warranted under the facts of this case.

We must be mindful that our inherent power to sanction is to be exercised with restraint and caution. *Knutson Mortgage Corp. v. Coleman*, 24 Kan. App. 2d 650, 652, 951 P.2d 548 (1997). "Because inherent powers are shielded from direct democratic controls, they must be exercised with restraint and discretion." *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764-65, 65 L. Ed. 2d 488, 100 S. Ct. 2455 (1980); see *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44, 115 L. Ed. 2d 27, 111 S. Ct. 2123 (1991) ("Because of their very potency, inherent powers must be exercised with restraint and discretion."); see also *United States v. McCall*, 235 F.3d 1211, 1216 (10th Cir. 2000) (The bad faith exception to the rule prohibiting assessment of attorney fees in the absence of a statute "is drawn very narrowly and may be resorted to 'only in exceptional cases and for dominating reasons of justice.' "); *Dubois v. United States Dept. of Agriculture*, 270 F.3d 77, 80 (1st Cir. 2001) ("[T]he power to sanction must be used with great circumspection and restraint, employed only in compelling situations.").

In this case, the relief denominated as sanctions is the relief requested, warranted, and available in this mandamus action. Un-

der these circumstances, there is no compelling need, nor are there any dominating reasons of justice, to invoke our extraordinary inherent power to sanction. *Cf., Chambers v. NASCO, Inc.*, 501 U.S. at 50 (where bad faith conduct can be adequately sanctioned under other rules, the court ordinarily should rely on the rules rather than its inherent power to sanction). That being so, it is not appropriate to invoke our inherent power to order this relief.

Second, even if there were an extraordinary and compelling need to invoke our inherent power to sanction, doing so would have to be conditioned upon a finding that Kline acted in bad faith. In this case, however, the majority invokes our inherent power without making any finding that Kline engaged in bad faith conduct. It is well settled that a specific finding of bad faith is a prerequisite to the imposition of sanctions under the court's inherent power. *Roadway Express, Inc.*, 447 U.S. at 767 (a specific finding that the conduct at issue constituted bad faith must precede any sanction under the court's inherent powers); see also *Chambers v. NASCO, Inc.*, 501 U.S. at 49 (recognizing that the Court held in *Roadway Express* that a finding of bad faith is a prerequisite to invocation of the court's inherent power to sanction); *Knutson Mortgage Corp.*, 24 Kan. App. 2d at 654 (quoting *Roadway Express, Inc.*, 447 U.S. at 767) ("The Supreme Court made clear in *Roadway* that a specific finding as to whether counsel's conduct constituted bad faith 'would have to precede any sanction under the court's inherent powers.' ").

There is no finding that the conduct that the majority sanctions was committed in bad faith. Absent a specific finding of bad faith conduct, the court cannot impose sanctions under our inherent power.

Third, even if there was a finding of bad faith conduct, the sanction imposed bears no relationship to the majority of the conduct the court cites as the basis for the sanction. A sanction imposed under a court's inherent power is punitive in nature and, thus, must necessarily be connected to and remediate the results of the bad faith conduct. As the United States Supreme Court has stated, "[a] primary aspect" of the requirement that inherent powers be exercised with restraint and discretion, "is the ability to fashion an

appropriate sanction for conduct which abuses the judicial process." *Chambers v. NASCO, Inc.*, 501 U.S. at 44-45.

While the sanction imposed by the majority requires Kline to provide copies of records and investigative materials to the Attorney General, the laundry list of Kline's conduct cited by the court as justification for imposing the sanction bears virtually no relationship to Kline's failure to leave the incoming Attorney General a full and complete set of the records and investigative materials. Instead, the majority's grievances with Kline's conduct focus on the perception that Kline and his subordinates have shown a lack of respect for the court and the rule of law, disregarded "the clear import of the court's directions," (287 Kan. at 422), persisted in the attitude and behavior previously identified as problematic in *Alpha Med. Clinic v. Anderson*, 280 Kan. 903, 128 P.3d 364 (2006), and maximized jeopardy to the balance between the patients' privacy rights and law enforcement interests. Specifically, the conduct the majority identifies as justification for sanctions includes the following: evasive, ignorant and incomplete answers in the fact-finding process and during oral argument; deflecting responsibility and accountability for the actions of his subordinates; and orchestrated confusion concerning the extent of his control over Dr. McHugh.

In comparison, the only conduct mentioned by the majority that relates to the failure to leave a set of records for the incoming Attorney General is Kline's taking of the Women's Health Care Services of Wichita, P.A. (WHCS) records to Johnson County, the failure of Kline or Stephen Maxwell to correct the Status and Disposition Report to show the WHCS records were taken to Johnson County, and the failure to reveal that he had created summaries of the records. It must also be noted that the majority specifically declines to impose sanctions on Kline for the conduct of which CHPP complains—Kline's handling of the records during the transfer from the Attorney General's office to the Johnson County District Attorney office and on access and dissemination of the records and their content once they were in Kline's hands. 287 Kan. at 419.

This disconnect between the sanction imposed and the conduct that serves as the majority's justification for sanction, coupled with

the fact that the sanction the majority fashions could simply be ordered as relief in this mandamus action, reveals that the majority is more interested in reprimanding Kline for his attitude and behavior in the course of this litigation than in remediating the failure to leave a complete set of the investigation records for the incoming Attorney General. It appears to me that the majority invokes our extraordinary inherent power to sanction simply to provide a platform from which it can denigrate Kline for actions that it cannot find to have been in violation of any law and to heap scorn upon him for his attitude and behavior that does not rise to the level of contempt. This is the very antithesis of "restraint and discretion" and is not an appropriate exercise of our inherent power.

Lastly, I strongly disagree with the last paragraph of the majority opinion. In that paragraph, the majority notes that "further instances of Kline's improper conduct . . . may yet come to light," and warns that, if it does, such conduct may merit contempt, discipline up to and including disbarment, or other sanctions. 287 Kan. at 425. This vague statement seems to anticipate and encompass the discovery of additional past or future misconduct.

What is the point of this paragraph? Upon compliance with the simple requirements of the "sanction" imposed, the case is over, done, finished. I believe it is inappropriate to set forth, as if to threaten the respondent with, the various penalties that could be imposed if some past or future hypothetical misconduct should "come to light" at a later date.