NOT DESIGNATED FOR PUBLICATION

No. 117,044

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

JOHN F. WILLIAMSON, D.D.S.,
*Appellee*,

v.

LOIS D. ROBERTS, INDIVIDUALLY and as TRUSTEE of the LOIS ROBERTS
REVOCABLE TRUST U/D/T DATED JANUARY 31, 2006,
*Appellant*.

MEMORANDUM OPINION

Appeal from Wyandotte District Court; DANIEL A. DUNCAN, judge. Opinion filed June 15, 2018.
Vacated.

*Tai J. Vokins* and *Krystal L. Vokins*, of Sloan, Eisenbarth, Glassman, McEntire & Jarboe, L.L.C.,
of Lawrence, for appellant.

*Jeffrey R. King* and *Desarae Harrah*, of Collins & Jones, P.C., of Raymore, Missouri, for
appellee.

Before BUSER, P.J., BRUNS, J., and STUTZMAN, S.J.

BUSER, J.:  This appeal is the latest legal development regarding a longstanding
property dispute between Lois D. Roberts, trustee of the Lois Roberts Revocable Trust
(Roberts), and John F. Williamson, regarding water run-off onto Williamson's property.
The dispute was initially resolved in 2006 when a settlement agreement was finalized by
the parties. Five years later, in September 2011, however, the district court ordered
specific performance of the settlement agreement, requiring Roberts to pipe water from
the K-32 culvert to the south end of her property. Five years after that order, in November

1

2016, the district court found Roberts in direct civil contempt for her failure to comply with the order of specific performance.

Roberts now appeals the district court's direct civil contempt order. She asserts: (1) the order is void for lack of jurisdiction because it failed to include her defense in the journal entry of contempt; (2) the penalty is punitive and not remedial in nature; and (3) it is impossible for Roberts to comply with the district court's order of specific performance. Upon our review, we hold the district court erred in finding Roberts in direct civil contempt. Accordingly, we vacate the order.

FACTUAL AND PROCEDURAL BACKGROUND

Prior to 2006, Williamson purchased property in Edwardsville for his dental practice. Williamson's property was adjacent to land owned by Roberts.

In 2006, Williamson sued Roberts for trespass to property and nuisance because she had removed some trees and constructed a stone wall on Williamson's property and was directing storm water in the direction of his property. Before the construction, storm water had flowed from a pipe south to the end of the property. After the construction, the storm water was diverted onto Williamson's property where it accumulated around his building.

On December 15, 2006, the parties entered into a settlement agreement. The agreement "required [Roberts] to pipe the water discharged from the K-32 culvert on [Roberts'] property to the south end of her property." Roberts failed to comply with the settlement agreement. Although she removed the rocks from Williamson's property, she did not change the new grade of her land or pipe the water discharged from the K-32 culvert to the south end of her property.

2

More than three years after the execution of the settlement agreement, on February 12, 2010, Williamson filed another petition against Roberts, seeking specific performance of the 2006 settlement agreement, injunctive relief compelling Roberts to "prevent the diversion of storm water onto [Williamson's] property," and monetary damages.

A trial was held on September 20, 2011. During the trial, Roberts informed the district court that a portion of her property adjoining Williamson's property had been sold to a third party and was being leased to Dollar General. At the conclusion of the hearing, the district court entered judgment in favor of Williamson, awarding him monetary damages of $5,689.40 for plumbing services and costs and fees of $217.01.

Noting that "storm water continues to flow into plaintiff's property from the east," the district court also ordered specific performance of the 2006 settlement agreement requiring Roberts to pipe the water from the K-32 culvert to the south end of her property. Additionally, Roberts was "enjoined from allowing any storm water to flow onto" Williamson's property from the land immediately to the east of Williamson's property. Acknowledging that Dollar General was now occupying the property adjacent to Williamson's property, the district judge acknowledged the difficulty in granting specific performance by stating, "Now how it can be accomplished in a practical world, I don't know, particularly if she has sold this property." Williamson's counsel suggested the district court "enjoin the nuisance" in an attempt to assert that the property is "subject to this pending lawsuit." The district court agreed to enjoin the nuisance. Roberts did not appeal the adverse judgment.

After paying the monetary award, Roberts filed a motion for satisfaction of judgment. A hearing on the motion was held on August 8, 2012, and the district court denied the request, noting that Roberts should do what she had "pledged to do in two separate lawsuits." The district court directed that "if Dollar General stands in your way,

3

then add them as a necessary party to this lawsuit, bring them in front of the Court, and we will let them know what needs to be done."

One year later, on August 12, 2013, Williamson filed an accusation in contempt against Roberts, alleging that Roberts had failed to construct the pipe from the K-32 culvert to the south end of the property. The district court entered an order for Roberts to appear and show cause why she should not be found in contempt.

A hearing on the contempt accusation was held on September 24, 2014. Williamson's counsel acknowledged the intervening sale of a portion of Roberts' property on which the Dollar General Store was located. He stated the "engineering was done" and "approved by the city." Williamson's counsel explained that instead of laying a pipe that connected to the culvert and ran to the back of the property, Dollar General "put in a pipe that connected to the culvert, ran back 30 feet or so, and then day-lighted it within a couple of feet of Dr. Williamson's property." As a result, Williamson's counsel complained that the "water problems continue."

On the other hand, Roberts' counsel argued that the city and the Kansas Department of Transportation (KDOT) were preventing her from obtaining the required permits to perform the work. Roberts explained that she had tried to specifically perform by contacting KDOT, which controls the culvert, and obtain the permits to connect to the culvert. Because Roberts had been unable to obtain the work permits from governmental authorities, however, she claimed impossibility of performance.

The district court found that Roberts did not need a permit to pipe the water "to the south end of her property" as required by the 2011 judgment. The following exchange then occurred between the district court and Roberts' counsel:

4

"THE COURT: Whether it's connected to the culvert in front or not, the problem is getting to the—water to the south end of the property.

"MR. JESERICH: No, that's something we're agreeing to do.

"THE COURT: Well, then, do it.

"MR. JESERICH: We can't do that—we can't get connected to the culvert, Judge.

"THE COURT: You don't need to be connected to the culvert to get the water to the south end of the property, Mr. Jeserich.

"MR. JESERICH: If they are agreeable to that, that we can do that without connecting to the culvert, we'll do it. We will do that if they will agree that we don't have to connect to the culvert to accomplish that, we'll get that work done. It's that simple. We haven't done it because of your specific directions and orders were to get a connection from the culvert to the existing—to a pipe that goes all the way to the back.

"THE COURT: It's my understanding there's a culvert under the road.

"MR. JESERICH: Yes.

"THE COURT: There's a ditch.

"MR. JESERICH: Yes.

"THE COURT: Water collects in that ditch, and there's a drain that's already started that goes to the south, but doesn't go all the way.

"MR. JESERICH: That's correct.

"THE COURT: To the south end of the property.

"MR. JESERICH: That's correct.

"THE COURT: The problem is, where that drain stops, the water comes onto Mr. Williamson's property. So do the drain from where it stops, to the south end of the property, and see whether or not that corrects the problem.

"MR. JESERICH: Judge, that's fine with us if that's fine with them. But we have—that's nothing.

"THE COURT: That's my order today, do it."

At the conclusion of the colloquy, Roberts agreed to obtain a bid for the work within a week and to reach an agreement with Williamson's counsel for completing the work required by the order for specific performance.

5

More than a year later, on March 1, 2016, Williamson filed another accusation and affidavit for contempt, and Roberts was again ordered to appear in district court. Shortly thereafter, Roberts filed a response to Williamson's motion, denying that she willfully violated the orders of the district court and requesting an evidentiary hearing. In the response, Roberts asserted:

"Defendants in fact worked out a solution to the perceived problem of the water drainage, but Plaintiff backed out of the agreement.

"Plaintiff describes very substantial damages, yet has taken no steps to pursue this for well over a year from the date he backed out of the agreed 'fix' to the property.

"In addition, the claims of additional structural damage to Plaintiff's building and septic system are unfounded, and [defendants] are entitled to engage in discovery and present evidence that the damages claimed by Plaintiff are not the result of water coming through the K-32 culvert or from the Dollar General drainage system.

"Defendants in good faith believe that this proceeding is brought now because Plaintiff wants to receive money damages entirely out of proportion to any actual damages sustained."

Several months later, on October 19, 2016, Roberts filed a motion to deny contempt, alleging that her performance under the 2006 settlement agreement was legally impossible. Roberts argued "the parties, their counsel, engineers, and contractors" met at the property shortly after the September 24, 2014 hearing to agree upon a plan to comply with the district court's order but the only plan Williamson would agree to "required a party not a party to the lawsuit to enter into a contract with [Williamson] to bid the job, guarantee the construction, and maintain the 'structure' and granted an ongoing lien on that party's property to insure maintenance of the structure." Roberts claimed she was "obviously unable to force any third party to do this" and was in the impossible position of not being able to comply with the district court's order. Roberts additionally asserted it was impossible to connect the discharge pipe due to city permit issues and because

6

Williamson's proposal to pipe the water required permission of the current owner of the property.

An evidentiary hearing on the contempt motion was held on October 20, 2016. Williamson presented the testimony of Ronald Korody, a contractor and engineer, who testified regarding the construction of the Dollar General property and its effect on the water drainage problem. Korody explained how the construction of the Dollar General building had caused the drainage problem to change. Korody's engineering plan for a drainage system included terms and conditions for whoever owned the affected property to clean out and maintain the system. Korody acknowledged problems in obtaining agreement by Dollar General to those terms and conditions.

Robert Quick, a civil engineer, also testified on behalf of Williamson. Quick explained that the sale of the property and the new construction affected the existing water drainage problems. He testified that "the building and the parking lot made that property impervious to rain water. So the water that landed directly in that area, ran onto [Williamson's] property faster than it would if it was still grass, but that was about the only change."

Williamson acknowledged that permission from Dollar General was needed to work on the property and someone needed "to maintain a swell for the drain-way." Williamson said he had received an email informing him that Roberts did not have Dollar General's permission to proceed with construction.

For her part, Roberts testified that she met with a team at the site in an attempt to develop a plan for compliance with the district court order. Roberts proposed that a concrete wall be built to remedy the problem, but Williamson would not agree to that solution. Williamson wanted Roberts to put in a drainage system and monitor it. Both Roberts and Dollar General had objected to Williamson's solution. As a result, no

remedial construction had occurred. Roberts acknowledged that Williamson extended a settlement offer, but she was out of town and had suffered two heart attacks. By the time she returned, the offer had expired. Roberts also testified that when she was selling the property, Dollar General assured her that it would "do a water study" and "put in these pipes that I never could afford to put in."

Roberts explained her noncompliance with the district court's order:

"Your Honor, I grew up in the country. I didn't know that you was supposed to tear out pipes in a good system and do another one. I will put in that 24-inch pipe if you want me [to]. But their pipes are very well. I have had contractors. I've had engineers, they say the system is fine. He talks about his foundation. It sets on a berm. Dollar General sets here, it's—it's a drainage between us that the State will not let you cover up, because I've been to them many times and they won't. And on this berm in his building, it sets up. There is no way that water can go uphill. And for many years he didn't have, uh—

. . . .

"—gutters. And he just put gutters up a few years ago."

Additionally, Roberts acknowledged that she had the ability to install the pipe, but she did not want to because it would be detrimental to further development of the property that she still owned. Roberts said, "Well, if you want me [to] put a pipe in right there, I can do it, but when either one of us develops it, it's going to be detrimental."

At the conclusion of the hearing, the district court found Roberts to be in "direct civil contempt." It stated that the matter came before the district court to enforce a settlement agreement that was agreed to by all parties. The district court also noted that on two separate occasions, Roberts had "sat in that same chair and faithfully promised to do this, and [she had] done next to nothing."

8

The district court ordered Roberts to make an immediate payment of $108,000 to the district court, weekly penalties of $2,000 per week until construction commenced, and $1,000 a week until construction was completed. The district judge stated it would "have a hearing [after construction was completed] to determine what I'm going to do with that fine." The ruling was memorialized in a journal entry dated November 21, 2016, finding Roberts in direct civil contempt of the district court's September 24, 2014 order.

Roberts filed a timely notice of appeal.

IS THE ORDER OF CONTEMPT VOID FOR LACK OF JURISDICTION?

Our court employs a dual standard of review in an appeal from a finding of contempt of court. We apply a de novo standard of review to determine whether the alleged conduct is contemptuous. An abuse of discretion standard is applied in reviewing the sanctions imposed. *In re M.R.*, 272 Kan. 1335, 1342, 38 P.3d 694 (2002); *In re Marriage of Shelhamer*, 50 Kan. App. 2d 152, 154-55, 323 P.3d 184 (2014).

There is no inherent power of a district court to punish for contempt. That power is provided by Kansas law. See K.S.A. 20-1201 et seq.; *In re M.R.*, 272 Kan. at 1340-41. K.S.A. 20-1201 et seq. regulates the district court's power to impose sanctions for contempt of court. Compliance with these statutory provisions is important because any contempt order that fails to comply with statutory requirements may be void for lack of jurisdiction. See *Harsch v. Miller*, 288 Kan. 280, 295, 200 P.3d 467 (2009) (under K.S.A. 20-1203, void for lack of statement of defense on the record); *Padron v. Lopez*, 289 Kan. 1089, 1106-07, 220 P.3d 345 (2009) (under K.S.A. 20-1204a[b], void for lack of order to show cause).

"Civil contempt is the failure to do something ordered by the court for the benefit or advantage of another party to the proceeding." *Edmiston v. First Nat'l Bank of*

*Holcomb*, 242 Kan. 13, 15, 744 P.2d 829 (1987). "Appellate review focuses on whether the facts of the case show conduct that constitutes contempt. [Citation omitted.]" *In re Marriage of Brotherton*, 30 Kan. App. 2d 1298, 1301-02, 59 P.3d 1025 (2002).

For her first issue on appeal, Roberts contends the district court issued a direct contempt order which is void for lack of jurisdiction because it did not include a statement of Roberts' defense or extenuation to the accusation. In response, Williamson does not assert that the district court's order of contempt included a statement of Roberts' defense or extenuation to the accusation. Rather, Williamson counters that "[d]espite the use of the phrase 'direct contempt' in the District Court's October 2016 Order, it is clear that the contempt at issue is actually *indirect* contempt." (Emphasis added.)

The existence of jurisdiction is a question of law over which an appellate court's scope of review is unlimited. *Harsch*, 288 Kan. at 295.

Preliminarily, K.S.A. 20-1202 sets out two major classes of contempt: direct or indirect. "Direct contempt is committed during the sitting of the court or before a judge at chambers. All other contempts are indirect." *In re J.T.R.*, 47 Kan. App. 2d 91, 95, 271 P.3d 1262 (2012); see K.S.A. 20-1202. The key to the jurisdictional question on appeal is whether the district court found Roberts in direct or indirect civil contempt. If the district court held Roberts in direct contempt, then the requirements of K.S.A. 20-1203 must be met.

At the conclusion of the October 20, 2016 hearing, the district court stated, "Alright, the Court finds the defendant in direct civil contempt." This finding was memorialized in the district court's November 21, 2016 journal entry which stated: "After the presentment of evidence by both parties, arguments of counsel and review of the file, the Court finds Defendants in direct civil contempt of its order entered on September 24, 2014."

10

Here, Roberts' contemptuous conduct did not occur while she was sitting in court or before the judge in chambers. See K.S.A. 20-1202. In short, it appears the district court mistakenly entered an order of direct civil contempt, when Roberts' actions or inactions were more appropriately sanctionable by an order of indirect civil contempt. Regardless, based on a review of the district court's statements made at the hearing and the subsequently filed journal entry, it is apparent the district court found Roberts in direct civil contempt.

K.S.A. 20-1203, the direct contempt statute, provides:

"[A] direct contempt may be punished summarily, without written accusation against the person arraigned, but if the court or judge in chambers shall adjudge him guilty thereof a judgment shall be entered of record, in which shall be specified the conduct constituting such contempt, *with a statement of whatever defense or extenuation the accused offered thereto*, and the sentence of the court thereon." (Emphasis added.)

It is undisputed that the journal entry of judgment in this case did not contain any statement of defense or extenuation offered by Roberts. This omission is consequential: "Kansas appellate courts have held that such a failure to follow the requirements of [K.S.A.] 20-1203 is fatal; indeed, the defect is jurisdictional and the order therefore void." *Harsch*, 288 Kan. at 295. Moreover, in *Harsch*, as in the case on appeal, our Supreme Court found that "while counsel's reasons presented to the district court are amply contained in the record on appeal, their presence there cannot cure the defect caused by their absence in the journal entry." 288 Kan. at 295. As a result, the Supreme Court reversed the holding of contempt and the sanctions imposed for lack of jurisdiction. 288 Kan. at 295.

We conclude that the district court erred by holding Roberts in direct civil contempt and failing to comply with the requirements of K.S.A. 20-1203. In particular, the district court's order failed to state any defense or extenuation offered by Roberts in

11

this contempt action. Because the defect is jurisdictional, the order of contempt is void. See 288 Kan. at 295. And a "'void judgment is a nullity and may be vacated at any time.' [Citations omitted.]" *Board of Jefferson County Comm'rs v. Adcox*, 35 Kan. App. 2d 628, 635-36, 132 P.3d 1004 (2006).

We hold the district court's order of direct civil contempt is void. Accordingly, the order is vacated.

WERE THE SANCTIONS PUNITIVE RATHER THAN REMEDIAL?

For the sake of completeness, and in the event this matter is revisited by the district court in the future, we will next address Roberts' contention that the district court abused its discretion in imposing sanctions that were punitive rather than remedial in nature.

When reviewing the sanctions imposed for contempt, appellate courts apply an abuse of discretion standard. *In re Marriage of Shelhamer*, 50 Kan. App. 2d at 154-55. An abuse of discretion may occur when the district court's ruling is based on an error of law. *Wiles v. American Family Life Assurance Co.*, 302 Kan. 66, 74, 350 P.3d 1071 (2015).

Roberts asserts the penalty imposed here is punitive rather than remedial in nature. The court ordered Roberts to pay $108,000, which the district court indicated represented $1,000 per week for the 108 weeks from September 24, 2014, until October 20, 2016, during which time the district court found Roberts in contempt of its order. Additionally, the district court ordered Roberts to pay $2,000 per week until construction is commenced and $1,000 per week once construction is commenced until completion. Roberts claims these penalties do not encourage her to comply with the order in order to

12

be free from the penalties. She asserts the penalties constitute a punitive fine and continue even after construction begins.

On the other hand, Williamson asserts the penalties are remedial, not punitive because the district court ordered the funds to be deposited with the district court, but the court indicated that a subsequent hearing will be held to determine how the funds should be handled. Williamson suggests that the funds may even be refunded.

Proceedings in civil contempt are remedial in nature and designed to advance the private right of a litigant won by an underlying court order. A penalty inflicted for civil contempt is intended to be coercive, and relief can be achieved only by full compliance with the court's order. Any sentence imposed for civil contempt must permit the contemnor to "'unlock the door of the . . . jail and discharge herself by doing what she has previously failed to do.' [Citation omitted.]" *Comprehensive Health of Planned Parenthood v. Kline*, 287 Kan. 372, 417-18, 197 P.3d 370 (2008).

"If the object of the procedure is to coerce the contemnor into complying with a court's order, then it is a civil contempt action." *In re J.T.R.*, 47 Kan. App. 2d at 96. Further, "[a]ny penalty inflicted for civil contempt is intended to be coercive, and relief can be achieved only by compliance with the order." *Comprehensive Health of Planned Parenthood*, 287 Kan. at 417.

We are persuaded that Roberts has the better argument. The lump sum payment and future monthly payments are more punitive than remedial. The lump sum payment, in particular, was imposed without providing Roberts any opportunity to mitigate the sanction and avoid payment of $108,000. Although Roberts speculates that the district court might forgive some or all of this sum upon her compliance, a review of the hearing transcript and journal entry provides no factual basis for this conjecture. In short, the lump sum sanction has all of the characteristics of a fine or punishment for past non-

compliance rather than a remedial measure to encourage Roberts to comply with the district court's order in the future.

When a penalty is punitive in nature, it must be set aside. See *In re J.T.R.*, 47 Kan. App. 2d at 98 (five-day unconditional sentence in county jail is an unlawful form of civil contempt). Although we have vacated the contempt order, we also find the district court erred in it choice of sanctions to enforce the order.

Finally, given our holding vacating the direct civil contempt order, we decline to review the final issue Roberts raises on appeal, that compliance with the district court's orders in this case was impossible.

The district court's order of direct civil contempt is vacated.